**11-1858-cv**
**Adelphia Recovery Trust v. Goldman, Sachs & Co., et al.**

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: April 25, 2012          Decided: April 4, 2014)

Docket No.  11-1858-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ADELPHIA RECOVERY TRUST, AKA THE ADELPHIA CONTINGENT VALUE
VEHICLE,
        Plaintiff-Counter-Defendant-Appellant,

ADELPHIA COMMUNICATIONS CORP., AND ITS AFFILIATED DEBTORS AND
DEBTORS IN POSSESSION, OFFICIAL COMMITTEE OF EQUITY SECURITY
HOLDERS OF ADELPHIA COMMUNICATIONS CORP., OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF ADELPHIA COMMUNICATIONS CORP.,
        Plaintiffs-Counter-Defendants,

        v.

GOLDMAN, SACHS & CO.,
        Defendant-Appellee,

HARRIS NESBITT CORP., DEUTSCHE BANK AG, BANK OF NEW YORK COMPANY,
INC., DAI-ICHI KANGYO BANK, LTD., THE INDUSTRIAL BANK OF JAPAN,
LIMITED, IBJ WHITEHALL FUNDING 2001 TRUST, MIZUHO CORPORATE BANK,
LTD., J.P. MORGAN SECURITIES, INC., MOUNTAIN CAPITAL CLO I,
MOUNTAIN CAPITAL CLO II, UBS AG, MELLON BANK, N.A., J.P. MORGAN
SECURITIES, INC., DEUTSCHE BANK AG, J.P. MORGAN CHASE BANK, N.A.,
NATIONWIDE LIFE INSURANCE COMPANY, NATIONWIDE LIFE AND ANNUITY
INSURANCE COMPANY, NATIONWIDE MUTUAL INSURANCE COMPANY, MARATHON
SPECIAL OPPORTUNITY MASTER FUND, LTD., SPRUGOS INVESTMENTS IV,
L.L.C., BNP PARIBAS, FIRST HAWAIIAN BANK, NON-AGENT LENDERS,
PUTNAM DIVERSIFIED INCOME TRUST, PUTNAM HIGH YIELD ADVANTAGE
FUND, PUTNAM HIGH YIELD TRUST, PUTNAM MASTER INCOME TRUST, PUTNAM
MASTER INTERMEDIATE INCOME TRUST, PUTNAM PREMIER INCOME TRUST,
PUTNAM VARIABLE TRUST—PVT DIVERSIFIED INCOME FUND, PUTNAM
VARIABLE TRUST—PVT HIGH YIELD FUND, PUTNAM FLOATING RATE INCOME
FUND, PUTNAM FUNDS TRUST-PUTNAM HIGH YIELD TRUST II, PUTNAM HIGH
YIELD FIXED INCOME FUND, PUTNAM HIGH YIELD MANAGED TRUST, PUTNAM

MANAGED HIGH YIELD TRUST, PUTNAM STRATEGIC INCOME FUND, TRAVELERS SERIES FUND, INC.-PUTNAM, KZH HOLDING CORPORATION III, KZH CYPRESS TREE-1 LLC, KZH III LLC, KZH ING-2 LLC, KZH LANGDALE LLC, KZH PONDVIEW LLC, KZH SHOSHONE LLC, KZH WATERSIDE LLC, KZH CNC LLC, KZH HIGHLAND-2 LLC, KZH ING-1 LLC, KZH ING-3 LLC, KZH PAMCO LLC, KZH SOLEIL-2 LLC, KZH STERLING LLC, KZH RIVERSIDE LLC, KZH SOLEIL LLC, MERRILL LYNCH PIERCE, FENNER & SMITH INCORPORATED, MERRILL LYNCH CREDIT PRODUCTS LLC, MIZUHO GLOBAL LIMITED, APEXTRIMARAN-CDO I, LTD., CARAVELLE INVESTMENT FUND, L.L.C., CARAVELLE INVESTMENT FUND II, L.L.C., GOLDMAN SACHS CREDIT PARTNERS, L.P., SEI INSTITUTIONAL INVESTMENTS TRUST AND THE SEI INSTITUTIONAL MANAGED TRUST, FIFTH THIRD BANK, FLEET NATIONAL BANK, BANK OF TOKYOMITSUBISHI TRUST COMPANY, N/K/A BANK OF TOKYO-MITSUBISHI UFJ TRUST COMPANY, MITSUBISHI UFJ TRUST AND BANKING CORPORATION, HALCYON FUND, L.P., EXIS HOLDING LTD., RBS CITIZENS, N.A., KZH ENTITIES, DEUTSCHE BANK AG NEW YORK BRANCH, HCM/Z SPECIAL OPPORTUNITIES LLC, PHOENIX-GOODWIN HIGH YIELD FUND, BNY MELLON CAPITAL MARKETS, LLC, CITIGROUP GLOBAL MARKETS INC., BANK OF TOKYOMITSUBISHI TRUST COMPANY, MITSUBISHI TRUST AND BANKING CORPORATION, CIBC WORLD MARKETS INC., CREDIT SUISSE, NEW YORK BRANCH, SUNTRUST ROBINSON HUMPHREY, INC., CREDIT SUISSE CAPITAL FUNDING, INC., THE BANK OF NEW YORK MELLON, SOCIETE GENERALE, COWEN AND COMPANY, LLC, BMO CAPITAL MARKETS CORP., SUN TRUST BANK, BANK OF AMERICA SECURITIES LLC,
   Defendants,

THE FUJI BANK, LIMITED, THE TORONTO-DOMINION BANK,
   Defendants-Consolidated-Defendants,

TORONTO DOMINION (TEXAS) LLC, THE BANK OF NOVA SCOTIA, CREDIT SUISSE (USA), INC., TD SECURITIES (USA) LLC,
   Defendants-Consolidated-Defendants-Counter-Claimants,

BANK OF AMERICA, N.A., INDOSUEZ CAPITAL FUNDING IIA, LTD., LCM I LIMITED PARTNERSHIP, CALYON NEW YORK BRANCH, CALYON SECURITIES (USA), INC., LIMITED AND INDOSUEZ CAPITAL FUNDING VI, LTD., BANK OF NEW YORK CAPITAL MARKETS, INC., HSBC BANK USA, NATIONAL ASSOCIATION, BANK OF MONTREAL, CITIBANK, N.A. AND CITICORP USA, INC., BARCLAYS BANK PLC, PNC BANK, N.A., DEUTSCHE BANK TRUST COMPANY AMERICAS, SOCIETE GENERALE, S.A., MERRILL LYNCH & CO., INC., MERRILL LYNCH CAPITAL CORP., BANK OF NEW YORK, ABN AMRO BANK, N.V., COOPERATIVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., "RABOBANK NEDERLAND" NEW YORK BRANCH, MORGAN STANLEY SENIOR FUNDING, INC.,
   Defendants-Counter-Claimants,

WACHOVIA BANK, NATIONAL ASSOCIATION,
   Defendant-Bankruptcy-Movant-Counter-Claimant,

2

WACHOVIA CAPITAL MARKETS LLC, CITIGROUP GLOBAL MARKETS HOLDINGS, INC., COWEN & CO., LLC, SCOTIA CAPITAL (USA), INC.,
    Consolidated-Defendants-Counter-Claimants,

CITIGROUP FINANCIAL PRODUCTS, INC.,
    Consolidated-Defendant,

ABN AMRO INC., DEUTSCHE BANK SECURITIES, INC., FLEET SECURITIES, INC., CIBC WORLD MARKETS CORP., MORGAN STANLEY & CO. INCORPORATED, BARCLAYS CAPITAL INC., SUNTRUST CAPITAL MARKETS, INC., BANC OF AMERICA SECURITIES LLC., PNC CAPITAL MARKETS LLC, CIBC INC., BMO CAPITAL MARKETS FINANCING, INC., SUNTRUST BANK, THE ROYAL BANK OF SCOTLAND PLC,
    Counter-Claimants.

- - - - - - - - - - - - - - - - - - -- - - - - - - - - - - - -

B e f o r e:   WINTER, WALKER, and CABRANES, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York (Lawrence M. McKenna, Judge) granting summary judgment to defendant-appellee Goldman, Sachs & Co. and dismissing Adelphia Recovery Trust's fraudulent conveyance claim brought pursuant to 11 U.S.C. § 548(a)(1)(A). We affirm on grounds of judicial estoppel.

DAVID M. FRIEDMAN (Michael C. Harwood & Howard W. Schub, on the brief), Kasowitz, Benson, Torres & Friedman, LLP, New York, NY, for Plaintiff-Counter-Defendant-Appellant.

MELVIN A. BROSTERMAN (Claude G. Szyfer and Francis C. Healy, on the brief), Stroock & Stroock & Lavan LLP, New York, NY, for Defendant-Appellee.

WINTER, Circuit Judge:

The Adelphia Recovery Trust, an entity created to represent the non-whole creditors of a debtor corporation that is party to a bankruptcy proceeding described below, appeals from Judge McKenna's grant of summary judgment dismissing its fraudulent conveyance claim against Goldman, Sachs & Co.  In such a

fraudulent conveyance claim, the Trust may recover only property owned by the parent-company debtor. The various schedules and Chapter 11 plan, which were consummated with the agreement of appellant and its predecessors in interest in the bankruptcy proceeding, all treated the property transferred as owned by a separate subsidiary. We, therefore, affirm on grounds of judicial estoppel.

BACKGROUND

Adelphia Communications Corp. ("ACC") was the parent company of some 200 holding and operating subsidiaries (collectively, "Adelphia"). At its peak, Adelphia formed the fifth-largest cable company in the United States. ACC, at all relevant times a publicly traded company, was founded by John Rigas in 1986, and members of the Rigas family held several top positions at ACC. After ACC disclosed that it had several billion dollars in fraudulently concealed, off-balance-sheet debt, Rigas family members were forced to resign from their positions and faced various civil and criminal actions. See, e.g., United States v. Rigas, 490 F.3d 208 (2d Cir. 2007).

On June 25, 2002, ACC and its subsidiaries entered bankruptcy under Chapter 11. Pursuant to an ensuing plan of reorganization, substantially all assets of ACC and its subsidiaries were liquidated, and all secured creditors of ACC and its subsidiaries were paid in full. In addition, all unsecured debt of the subsidiaries was also paid in full with interest, and a portion of ACC's unsecured debt was paid. Those

4

creditors of ACC who were not paid in full received an interest in any remaining assets that appellant can recover.

In July 2003, appellant's predecessor in interest filed suit against over 400 lenders, investment banks, and other financial institutions, seeking damages for their alleged participation in the Rigas family fraud. This action included the present action against Goldman, Sachs & Co. ("Goldman").[1]

Appellant's action against Goldman alleges a fraudulent conveyance under 11 U.S.C. §§ 548(a)(1)(A) and 550(a). It arose out of a 1999 multi-million margin loan that Goldman had extended to Highland Holdings II LLP ("Highland"), an entity owned by the Rigas family (a Rigas family entity, or "RFE") unconnected to Adelphia. The loan, which was secured by ACC stock owned by Highland, was allegedly used by the Rigases to purchase additional ACC stock and thereby to maintain their control over Adelphia. As ACC's stock price decreased following the disclosure of the fraudulent concealment of debt in 2002, Goldman issued several margin calls to Highland. The complaint alleged that the Rigases caused ACC to make cash payments of $63 million to cover these margin calls.

---

[1] On June 17, 2008, the claims asserted on behalf of ACC subsidiary debtors, who had already been paid in full, were dismissed for lack of standing. Adelphia Recovery Trust v. Bank of Am., N.A., 390 B.R. 80, 97 (S.D.N.Y. 2008). The remaining claims were ultimately settled or dismissed against all defendants other than Goldman, Sachs & Co. Although Goldman had also moved for dismissal of the claim against it, the district court allowed the claim to continue to summary judgment to determine whether the source of the payments to Goldman was ACC or a subsidiary.

5

Appellant's allegations against Goldman were amended several times at the suggestion of the district court.  The court was concerned that "[t]he Amended Complaint does not identify which fraudulent conveyances came from ACC and which came from the [subsidiaries].  This omission is significant because [appellant] lacks standing to pursue claims to recover for fraudulent conveyance on behalf of the [subsidiaries]."  <u>Adelphia Recovery Trust v. Bank of Am., N.A.</u>, No. 05-civ-9050, 2009 WL 1676077, at *2 (S.D.N.Y. June 16, 2009).  The district court, therefore, directed appellant to "submit a revised version of paragraph 1359 of the Amended Complaint.  The revised paragraph should identify which payments to [Goldman] came from ACC."  <u>Id.</u>

Pursuant to this order, appellant submitted a revised version of the complaint that alleged, in relevant part:

> [T]he Rigases caused ACC to commingle funds in the concentration account that it controlled, in the name of [a subsidiary] Adelphia Cablevision LLC, from such sources as customer receipts, liquidation of overnight investment accounts, and transfers from various subsidiary entities . . . in order to satisfy these margin calls.  On each date identified in the following charts, the Rigases caused ACC to direct that the funds it had gathered in the concentration account be distributed by Adelphia Cablevision LLC directly to the Margin Lenders or to the RFE for immediate payment over to the Margin Lenders.

Rev. Second Am. Compl. ¶ 1359.

It appears from this allegation and the record that the pertinent payments were made either:  (i) directly to Goldman

6

from a particular account (the "Concentration Account"), which contained most of the funds in the cash management system through which the collective cash of ACC and its subsidiaries was managed; or (ii) indirectly from the Concentration Account through an RFE and then to Goldman. Appellant seeks in this action to recover $63 million.

In the district court, and here, appellant faced the problem that the payments to Goldman were made in the name of the subsidiary, Adelphia Cablevision LLC, that held the Concentration Account and that has paid all its scheduled creditors, which did not include ACC, in full. Accordingly, appellant lacked standing to sue the subsidiary. It therefore argued, based on the amended allegation quoted above, that ACC was the real owner of, and payor from, the Concentration Account. Adelphia Recovery Trust v. Bank of Am., N.A., No. 05-cv-9050, 2011 WL 1419617 at *2 (S.D.N.Y. Apr. 7, 2011). The district court disagreed and granted Goldman's motion for summary judgment. Id. The court stated, "it is admitted by [appellant's] own revised pleading that the margin loan payments were not made by ACC but by Adelphia Cablevision LLC, an ACC subsidiary on whose behalf [appellant] does not have standing to sue." Id.

This appeal followed.

DISCUSSION

We review de novo whether Goldman was entitled to summary judgment as a matter of law. See, e.g., Miller v. Wolpoff &

7

_Abramson, L.L.P._, 321 F.3d 292, 300 (2d Cir. 2003); _Mario v. P&C Food Mkts., Inc._, 313 F.3d 758, 763 (2d Cir. 2002).

The sole issue is whether the amended complaint states a valid claim of a fraudulent conveyance under 11 U.S.C. §§ 548(a)(1)(A) and 550(a). Section 548(a)(1)(A) provides, in relevant part:

> The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the [bankruptcy] petition, if the debtor voluntarily or involuntarily . . . made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made[,] . . . indebted.

11 U.S.C. § 548(a)(1)(A). The avoidance power thus applies only to "transfers of property of the debtor," _Begier v. IRS_, 496 U.S. 53, 58 (1990), which includes "all legal or equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C. § 541(a)(1). Whether the margin loan payments to Goldman were transfers of the property of ACC, or should be deemed to be so, is the issue on appeal.

Appellant argues that we should follow decisions of the Fifth and Tenth Circuits, _Matter of Southmark Corp._, 49 F.3d 1111 (5th Cir. 1995) and _In re Amdura Corp._, 75 F.3d 1447 (10th Cir. 1996), to determine whether ACC was the true owner of the commingled Concentration Account. Together, these cases are said to support a principle of attributing ownership of funds aggregated in a communal account to a parent when the parent

8

exercises complete dominion over the funds, and has all legally cognizable indicia of ownership. In <u>Southmark</u>, the court determined that because Southmark owned and controlled the cash management account, the subsidiary's settlement payment from that account to its former president and director could be avoided by Southmark because the funds were part of, and under complete control by, Southmark's estate. 49 F.3d at 1117. And in <u>Amdura</u>, the court held that funds in a commingled cash management account belonged to the parent Amdura, even though subsidiaries had contributed to the account, because Amdura was listed as the owner and "possessed all other legally cognizable indicia of ownership." 75 F.3d at 1451.

However, neither decision was rendered in a legal context similar to the one before us or involved application of the judicial estoppel doctrine. Throughout the reorganization proceedings here, the Concentration Account was listed as an asset only of two successive ACC subsidiaries, not the property of ACC. The theory that the Concentration Account was actually the property of ACC appeared for the first time late in the present litigation, as described above, and well after consummation of the plan of reorganization.

Appellant's (or its predecessors' in interest) position in the bankruptcy proceedings regarding ownership of the account is

inconsistent with the claim it makes on appeal.[2]  Given the importance to bankruptcy proceedings of determining with finality a debtor's ownership of particular assets, we hold that appellants are estopped from pursuing a claim that would reattribute asset ownership based on a determination of asset ownership among the various entities agreed to by the pertinent parties, after a plan of reorganization has been confirmed and substantially consummated.

a) Principles of Judicial Estoppel

In New Hampshire v. Maine, the Supreme Court made clear that the exact criteria for invoking judicial estoppel will vary based on "specific factual contexts," and that "courts have uniformly recognized that its purpose is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." 532 U.S. 742, 749-51 (2001) (internal citations and quotation marks omitted).  New Hampshire explains that,

> Courts have observed that the circumstances
> under which judicial estoppel may
> appropriately be invoked are probably not

---

[2] Attribution of the Concentration Account to ACC required an explicit claim of ownership by ACC in the bankruptcy proceeding.  First, bank statements listed the account holder's Taxpayer ID Number as that corresponding to the ACC subsidiary National Cable Acquisition Associates. Second, within Adelphia the Concentration Account was referred to as the Adelphia Cablevision (an ACC subsidiary) account, and Adelphia Cablevision was the entity that made and received payments involved with the Account. Finally, any of ACC, its subsidiaries, or RFEs could direct that money be paid from the Account on their behalf by wire or check regardless of how much they had contributed to the account, and if at any time the payments on behalf of these entities exceeded the entity's contribution to the Account, an intercompany payable to Adelphia Cablevision by those entities was created.

10

reducible to any general formulation of principle. Nevertheless, several factors typically inform the decision whether to apply the doctrine in a particular case: First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. . . . A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. In enumerating these factors, we do not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel.

Id. at 750-51. (internal citations and quotation marks omitted).

Although we have recognized that "[t]ypically" the application of judicial estoppel requires showing unfair advantage against the party seeking estoppel, DeRosa v. Nat'l Envelope Corp., 595 F.3d 99, 103 (2d Cir. 2010) (requiring a party to show a clearly inconsistent position, adoption of that position by a court in an earlier proceeding, and unfair advantage against the party seeking estoppel in the ADA context), we have not required this element in all circumstances. See Maharaj v. BankAmerica Corp., 128 F.3d 94, 98 (2d Cir. 1997) (not requiring the element of unfair advantage); Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 6 (2d Cir. 1999) (same). This is consistent with New Hampshire's admonishment that the application of the judicial estoppel doctrine depends heavily on the "specific factual context[]" before the court. 531 U.S. at 751. We do note,

11

though, that every case emphasizes that "[b]ecause the doctrine is primarily concerned with protecting the judicial process, relief is granted only when the risk of inconsistent results with its impact on judicial integrity is certain." Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 397 (2d Cir. 2011) (internal quotation marks omitted).

Our holding in this regard is shaped by the context of a complicated bankruptcy proceeding involving 250 related, insolvent entities, and the risk to judicial integrity if we were to allow a party, after the consummation of a bankruptcy, to take a position that unravels key decisions in the proceedings. We first turn to a description of the legal mechanics of such a proceeding.

b) The Bankruptcy Context

Following a filing for Chapter 11 bankruptcy reorganization, the debtor must file "a list of creditors[,] a schedule of assets and liabilities[,] a schedule of current income and current expenditures[, and] a statement of the debtor's financial affairs." 11 U.S.C. § 521(a)(1). The debtor is given a 120-day exclusive period in which to submit a plan of reorganization, 11 U.S.C. § 1121(b), and a disclosure statement containing "adequate information" to allow interested parties to evaluate that plan. 11. U.S.C. § 1125(a)-(b). This plan includes items like complete asset schedules. See Sure-Snap Corp. v. State St. Bank & Trust Co., 948 F.2d 869, 873 (2d Cir. 1991); see also Chartschlaa v. Nationwide Mut. Ins. Co., 538 F.3d 116, 122 (2d Cir. 2008) (The

12

bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case" and "[i]t would be hard to imagine language that would be more encompassing than this broad definition." (internal citations and quotation marks omitted)).

The debtor is given 180 days, extendable up to 20 months by the court, from filing for Chapter 11 relief in which to obtain the approval of "each class of claims or interests that is impaired under the plan." 11 U.S.C. § 1121(c)-(d).  If the debtor fails to file a plan or the debtor's exclusive filing period expires without acceptance of a proposed plan by the parties in interest, any party in interest can file a competing plan and seek approval by the parties in interest.  11 U.S.C. § 1121(c). Both the debtor's plan and any competing plan must meet various mandatory provisions and may meet various discretionary provisions.  11 U.S.C. §§ 1122, 1123(a), (b).  Foremost among the mandatory requirements is that the plan designate classes of claims and classes of interests and specify how these classes will be treated under the plan.  11 U.S.C. §§ 1122, 1123(a).

Once a conforming plan has been proposed, parties in interest can vote to approve it.  Following approval by at least one class of impaired non-insider claims -- claims that will not be paid completely or will have some other right altered under the plan -- the court can confirm the plan and bind all creditors if the plan is feasible, was proposed in good faith, and is in compliance with the Bankruptcy Code.  11 U.S.C. § 1129(a)(10),

13

(b); Fed. R. Bankr. P. 3020(b)(2).  Once the plan is confirmed, the debtor is discharged from any prepetition debts, subject to specific exceptions not relevant here, as long as the confirmed bankruptcy plan is followed.  11 U.S.C. §§ 1141(d)(1), 523.

c) <u>Application of Judicial Estoppel</u>

As the recitation of bankruptcy procedures and time frames makes clear, debtors and creditors have ample periods of time within which to finalize asset ownership schedules and fashion a plan dependent upon those schedules.

In the present case, ACC filed for bankruptcy on June 25, 2002; the ultimately-confirmed plan was proposed on October 16, 2006; and the plan was confirmed on January 5, 2007, leaving over four and a half years to sort out whether ACC or a subsidiary owned the Concentration Account assets.  At no time during these proceedings did ACC or any party attribute ownership of the Concentration Account assets to ACC.  At the time of bankruptcy filing and again in February 2004, the ACC subsidiary ACC Operations, Inc. identified the Concentration Account as its property; ACC did not.  Amendments to the schedules of liabilities in January and May 2005 listed the ACC subsidiary Adelphia Cablevision as the owner of the Account in concluding that "intercompany transfers between a Debtor on the one hand, and Adelphia Cablevision [as owner of the Concentration Account] on the other hand, have been netted in the Intercompany Schedule, creating either a net payable or receivable intercompany balance between each such Debtor and Adelphia Cablevision."  ACC never

14

claimed the Account as one of its assets until such a claim of ownership was asserted in the present proceeding in 2009. Nor did any other party assert such a claim or seek a substantive consolidation of ACC and Adelphia Cablevision's bankruptcies, as permitted in bankruptcy proceedings to remedy circumstances where formally separate entities commingle and subject their collective assets to single control. See In re Augie/Restivo Baking Co., 860 F.2d 515, 518-19 (2d Cir. 1988).

Further, the bankruptcy plan undeniably was substantially consummated as early as 2007. In re Adelphia Comm'cns Corp., 367 B.R. 84, 94 (S.D.N.Y. 2007). Substantial consummation, as defined in 11 U.S.C. § 1101(2), requires the "transfer of all or substantially all of the property" in the plan, "assumption by the debtor . . . of all or substantially all of the property dealt with by the plan," and "commencement of distribution under the plan." Over $6 billion in cash, $117 million in tradeable Time Warner shares, and $9.5 billion in tradeable Adelphia Contingent Value Vehicle shares (shares set up as an interest in Adelphia recoveries against third party lenders and accountants) were distributed to claimholders as of early March 2007, just after confirmation of the plan. Since then, substantially all Adelphia's assets have been liquidated, returning approximately $18 billion to claimholders.

In the bankruptcy context, whether a party's position with regard to the ownership of assets is inconsistent with its later claims is largely informed by the bankruptcy court's treatment of

15

those claims.  See Galin v. United States, No. 08-cv-2508, 2008 WL 5378387, at *10 (E.D.N.Y. Dec. 23, 2008) ("adoption" in judicial estoppel "is usually fulfilled . . . when the bankruptcy court confirms a plan pursuant to which creditors release their claims against the debtor" (quoting Negron v. Weiss, No. 06-cv-1288, 2006 WL 2792769, at *3 (E.D.N.Y. Sept. 27, 2006))). Determination of the ownership of assets is at the core of the bankruptcy process, and particularly the creation of a bankruptcy reorganization plan, which involves "a schedule of all [the debtors'] liquid assets and liabilities," and thereafter operates, with full preclusive effect, to "bind its debtors and creditors as to all the plan's provisions, and all related, property or non-property based claims which could have been litigated in the same cause of action."  Sure-Snap Corp., 948 F.2d at 873 (citing 11 U.S.C. §§ 521(a)(1), 1141(a)).

It is therefore crucial, both for the sake of finality and the needs of debtors and creditors, that claims to ownership of various assets be determined in the bankruptcy proceedings. Particularly when, as here, the assets in question were claimed by other parties during the bankruptcy proceeding without objection, a debtor's subsequent claim to those assets in a different proceeding must be seen as inconsistent with its prior silence.[3]  Cf. Chartschlaa, 538 F.3d at 123 ("The Bankruptcy Code

---

[3] A party may be bound by the position taken by its predecessors in interest in prior proceedings.  See, e.g., Secured Equities Invs., Inc. v. McFarland, 753 N.Y.S.2d 264, 264 (4th Dep't 2002)).

is premised on full and complete disclosure of the debtor's finances."). Any other holding would encourage sharp practices, involving strategic denials or affirmations of asset ownership timed to the legal exigencies of the moment, precisely what the doctrine is intended to prevent.

The bankruptcy court's treatment of the asset schedules in the present matter underlies their importance and the need for finality. In order for the reorganization to proceed, the Adelphia entities underwent a massive restatement of their accounting records, which sought to provide separate, audited financials for each insolvent entity. In re Adelphia, 368 B.R. at 150-51. The allocation of assets to the various entities was of central importance to this process. One of the foremost difficulties the bankruptcy court encountered was the issue of intercompany transfers between the various entities controlled by the Rigas family. See id. at 152. The resolution of this problem depended on the parties' adoption of the so-called "Bank of Adelphia Paradigm,"[4] which tracked intercompany transfers through a single RFE subsidiary that controlled the main account: Adelphia Cablevision. Id. at 151-53. Adelphia Cablevision was listed as the owner of the Concentration Account in both the

---

[4] "[I]ntercompany transactions (e.g., cash receipts, disbursements, acquisition accounting and cost allocations) were deemed to have been made by or to a single entity, Adelphia Cablevision, LLC (the 'Bank of Adelphia'). This methodology, often referred to as the 'Bank of Adelphia Paradigm,' aggregated intercompany transaction balances consistent with the actual flow of funds within the Debtor's cash management system." In re Adelphia, 368 B.R. at 151.

17

January and May amendments to the debtors' schedules of assets and liabilities, and neither ACC nor appellant's predecessors in interest contested that determination.

The asset schedules thus played a key role in both the bankruptcy court's supervision of the process and in the parties' understanding of the plan. As the district court noted in its discussion of substantive consolidation, such relief was "highly unlikely" because "the Debtors have issued restated financial statements and filed the May 2005 Schedules, thus evidencing an ability to generally determine the assets and liabilities of each Debtor." Id. at 219 (discussing In re Augie/Restivo, 860 F.2d at 519) (internal quotation marks omitted). The Bank of Adelphia paradigm, which included Adelphia Cablevision's ownership of the account in the asset schedules, was the cornerstone of the bankruptcy plan, and without it the entire process would have been at risk of unraveling. We, therefore, decline to issue a ruling inconsistent with the factual underpinnings of this duly confirmed and substantially consummated bankruptcy plan.

A different ruling would threaten the integrity of the bankruptcy process by encouraging parties to alter their positions as to ownership of assets as they deem their litigation needs to change, leaving courts to unravel previously closed proceedings. Doing so would allow parties an opportunity to "play[] fast and loose" with the requirements of the bankruptcy process and inject an unacceptable level of uncertainty into its results -- exactly the result that the doctrine of judicial

18

estoppel is intended to avoid.  Wight v. BankAmerica Corp., 219 F.3d 79, 89 (2d Cir. 2000); accord In re Adelphia Recovery Trust, 634 F.3d at 696 (integrity of judicial process threatened by parties taking a short term position that risks being inconsistent with its future position, not only by "knowingly [lying]").

In relying upon the prospective harm to the integrity of bankruptcy proceedings that would result from a different ruling, we do not exclude the possibility of specific harm, or unfair disadvantage to, Goldman beyond the possible loss of $63 million. We simply decline to require Goldman and the courts having to unravel all previous proceedings to determine what would have happened had appellant or its predecessors in interest claimed ownership of the Concentration Account in a timely fashion.

We also do not exclude the possibility that, in an unusual case, the allocation of specific assets may be largely irrelevant to the bankruptcy court's actions.  However, given the centrality of asset allocation to the integrity of the bankruptcy process, see Chartschlaa, 538 F.3d at 122, particularly where multiple related entities are involved, a creditor who fails to lay claim to an asset in the bankruptcy court only to do so in subsequent litigation must, to prevail, bear the heavy burden of showing a de minimis effect on the bankruptcy proceeding.

                              CONCLUSION

The requirements of judicial estoppel are, therefore, met. The asset schedules showing that the Concentration Account was

19

held by a subsidiary of ACC were approved by appellant's predecessors in interest.  The bankruptcy court adopted the asset schedules and approved a plan of reorganization that treated ACC separately from its subsidiaries based on those schedules.  Revisiting the accuracy of those schedules to permit the present action to proceed would clearly threaten the integrity of bankruptcy proceedings.  We, therefore, hold that appellant's complaint is barred by the doctrine of judicial estoppel.  The judgment of the district court is affirmed.