PAUL A. CROTTY, United States District Judge
The action concerns an aircraft lease which guaranteed the aircraft's minimum market value, the Residual Value Guarantee ("RVG"), at the end of lease term, subject to certain conditions. Plaintiff Embraer S.A. ("Embraer") entered into the lease with a party whose rights in the agreement were subsequently transferred to Defendant, Dougherty Air Trustee, LLC ("Dougherty"). Complaint, Verde Ex.1 ("Compl.") at ¶¶ 10-14; Answer, Verde Ex. 2 ("Answer") at ¶¶ 10-14. The RVG required Dougherty to maintain its leasing agreement for the aircraft with Shuttle America Corporation ("Shuttle") or, if that lease terminated, to find a new lessee (the "Replacement Lessee") and enter into a new lease (the "Replacement Lease") that satisfied certain conditions by the RVG's expiration date. Compl. at ¶¶ 19-20; Answer at ¶¶ 19-20. Shuttle subsequently filed for bankruptcy and its lease with Dougherty was rejected. Compl. at ¶¶ 15-18; Answer at ¶¶ 15-18. Dougherty then purported to enter into a lease with Coleman Jet, LLC ("Coleman"). Compl. at ¶ 21; Answer at ¶ 21. The parties dispute whether the Coleman lease met the conditions necessary to revive the RVG and whether Dougherty is now entitled to payment.
*250 In February 2018, Embraer filed this declaratory judgment action seeking declarations that: (1) Coleman is not a Replacement Lessee; (2) the lease entered into with Coleman is not a Replacement Lease; (3) the RVG terminated automatically and was not revived under the relevant contract provision; and (4) Plaintiff is not obligated to make any residual value payment. Compl. at ¶ 11. Dougherty raised affirmative defenses and counterclaimed for (1) breach of contract for Embraer's refusal to pay the RVG and (2) breach of the implied covenant of good faith and fair dealing resulting from Embraer's alleged interference with the aircraft maintenance work. Answer at ¶¶ 28-32.
Embraer now moves for summary judgment granting the requested declaratory relief and dismissing Dougherty's counterclaims with prejudice. Dkt. No. 46. For the reasons that follow, Plaintiff's motion for summary judgment is GRANTED and Defendant's counterclaims are DISMISSED with prejudice.
BACKGROUND
This dispute centers around the sale and lease of a commercial jet aircraft EMB-145LR, manufactured by Embraer, bearing Registration Number N266SK and manufacturer serial number 145241, and two (2) Rolls-Royce Corporation AE 3007 AIP aircraft engines bearing serial numbers CAE 311373 and 311374 (collectively, the "Aircraft"). Compl. at ¶ 10; Answer at ¶ 10. Embraer sold the newly manufactured Aircraft to Solitair Corp. which, on May 18, 2000, sold it to Wells Fargo Bank North, National Association.[1] Compl. at ¶ 10; Answer at ¶ 10. Subsequently, the Aircraft was leased to Shuttle America Corporation ("Shuttle")[2] under a leasing agreement dated May 18, 2000 (the "Shuttle Lease"). Verde Ex. 4. The lease had a 16.5-year term with an expiration date of November 18, 2016 (the "Expiration Date"), although the lease could be extended for up to two years provided certain conditions were met. Id. at § 8.6.
The RVG
On the same day the parties entered into the Shuttle Lease, Embraer, Shuttle and Prior Owner Participant also executed Residual Value Guarantee DCT-016/00 (the "RVG Contract"). Verde Ex. 3. Under the RVG Contract, Embraer guarantees that the Aircraft's market value will amount to at least $5,204,724.00 (the "Lease Support RVG Level") by the lease's "Expiration Date." Id. If the Aircraft fails to meet this value, Embraer agrees to pay Prior Owner Participant the "Asset Value Deficiency," defined as the difference between the "Lease Support RVG Level," and the Aircraft's actual "Current Market Value" at the end of the lease term (the "RVG"). If the parties disagree about the value of the Aircraft at the end of the term, the RVG Contract calls for obtaining an appraisal and reaching agreement on the Aircraft's Current Market Value, defined as "an amount determined to be equal to the sales value that would be obtained in an arm's length transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer under no compulsion to buy." Id. at §§ 1, 5.
The RVG Contract also provides for certain "Termination Event[s]" which automatically *251 terminate Embraer's obligations to pay the RVG. Id at § 3. One event is the termination of the Shuttle Lease prior to the Expiration Date, Id. at § 3.3(d). But even after a Termination Event, Prior Owner Participant's lights to the RVG can be revived under Section 3.2 which provides:
(b) If this RVG has terminated pursuant to this Section 3.2, this RVG shall again automatically come into full force and effect provided that Owner Participant, or Owner Participant's designated owner trustee, enters into a replacement lease on substantially the same maintenance, assignment, and return terms and conditions as the Qualifying Lease (such lessee the "Replacement Lessee" and such lease the "Replacement Lease"). The Replacement Lessee under the Replacement Lease shall assume the obligations of Chautauqua under this RVG as if the Replacement Lease were the Qualifying Lease and as if the Replacement Lessee were Chautauqua. For the avoidance of doubt, the parties acknowledge that ... the Expiration Date shall remain unchanged irrespective of such replacement ...
(c) Owner Participant may lease the Aircraft only to an entity that (1) possesses a valid public transport certificate; (2) is authorized by all applicable laws, rules, and regulations to operate the Aircraft; (3) at the time the replacement lease begins, is generally able to pays its debts as they come due and is not subject to any voluntary or involuntary bankruptcy, insolvency, or similar proceedings; and (4) has a maintenance program consistent with the MRB EMB-145LR.
Id.
Beyond the requirement to maintain a lease, Section 4 of the RVG Contract also sets forth "Conditions to Payment" which must be satisfied "on the Expiration Date" or "as such date may be extended provided herein" before any claim to the RVG can be made. Id. Among these, Section 4(b) requires satisfaction with "the valuation conditions set forth in Exhibit A." Id. Exhibit A, in turn, contains "Aircraft Required Conditions" which include:
(b) Configuration - The Aircraft shall be in the same passenger configuration with all equipment installed therein as the Aircraft was when delivered by Embraer, ordinary wear and tear excepted, including replacements and substitute parts and equipment ...
(c) Certification - The Aircraft shall have, a valid and effective Certificate of Airworthiness of the type "Transport, Category (Passengers)" issued by the FAA, and shall be in full compliance with, and capable of registration under, the provisions of Part 121 of the U.S. Federal Aviation Regulations (or any successor legislation) and other US regulations applicable to the Aircraft's operation and continued airworthiness, without any restrictions corrections, repairs, limitations, modifications or alterations or overhauls having to be performed to meet such standards
Id. at A-1 - A-2. Exhibit A also requires the Aircraft to "have completed, within 100 flight hours of return, the next sequential 'C check," id. at A-6, understood in the industry as a "complete overhaul of the aircraft." Deposition of Alan Weingart Verde Ex. 17 ("Weingart Dep.") at 28.
In the event that "on the Expiration Date the Aircraft is not in full compliance with the valuation and return requirements *252 set forth in Section 4(b)," the RVG also provides for cure:
(i) within thirty (30) days [ ] or such longer period as permitted pursuant to this item i following the Expiration Date, Chautauqua shall restore the Aircraft or Owner Participant shall cause the Aircraft to be restored to the Required Conditions; provided that if Owner Participant is not able to cause the Aircraft to be so restored within thirty (30) days despite having diligently attempted to do so and Owner Participant promptly notifies EMBRAER of such inability, the thirty (30) day period shall be extended for so long as necessary to complete such restoration for up to a maximum of one hundred and fifty (150) additional days ... this period shall be further extended for up to a maximum of one hundred and eighty (180) additional days to the extent required due to unavailability of parts from Embraer.
Id. at 10, § 5(d)(1) (emphasis in original).
On or about April 18, 2006, Prior Owner Participant transferred its rights, title and interest in and to the Aircraft, the Shuttle Lease, the RVG, and the Trust Agreement to Dougherty. Answer ¶ 13. Embraer acknowledged this transfer by signing an agreement entitled "Acknowledgment (N266SK)" with Dougherty and Prior Owner Participant, among others. Id.
The Shuttle Bankruptcy
On February 25, 2016, Shuttle and its affiliates commenced voluntary bankruptcy cases under chapter 11 (the "Shuttle Bankruptcy") and on April 15, 2016, the bankruptcy court entered an order rejecting the Shuttle Lease. Verde Ex. 5. Shuttle returned the Aircraft to Dougherty shortly thereafter. Answer ¶ 18. Rejection of the Shuttle Lease meant that Dougherty's right to the RVG automatically terminated, although it could be revived by securing a new lease by November 18, 2016. Verde Ex. 3 at § 3.
On July 22, 2016, filed a proof of claim number 1088 (the "1088 Proof of Claim") in bankruptcy court claiming over $4.8 million in losses arising out of the Shuttle Lease rejection. Verde Ex. 6. In an attachment submitted along with the 1088 Proof of Claim, Dougherty explained that "[t]he breach of termination of the Lease Agreement prior to the end of the term of the Lease Agreement constitutes a Termination Event that can result in the Owner Participant not receiving the benefit of the RVG unless Lessor and Owner Participant enter into a 'Qualifying Lease' to replace the Lease Agreement." Id. at DOUGHERTY 2402. The 1088 Proof of Claim also included an Exhibit A providing an itemized list of its claims. After listing its individual claims, Dougherty reserved the right to add certain additional expenses and damages, including "Damages for Loss of the Residual Value Guarantee" in an amount "To Be Determined." Id. at DOUGHERTY 2406.
On January 20, 2017, almost six months after filing its 1088 Proof of Claim, Dougherty sent Shuttle's bankruptcy representative a Revised Claim ("Revised Claim"), Verde Ex. 18. The Revised Claim now requested $3,790,050.87, over $3.2 million of which came from purported damages for loss of the RVG. Id. at DOUGHERTY 7316. In an email sent with the Revised Claim, Dougherty stated "Embraer's refusal to pay is a loss for which Shuttle America is obligated to indemnify Dougherty pursuant to Section 12.1 of the Lease and is a valid component of Dougherty's claim in the bankruptcy." Id. at DOUGHERTY 7314.
Approximately a month later, on February 22, 2017, a motion was filed with the *253 bankruptcy court requesting approval of a settlement agreement awarding Dougherty approximately $1.95 million from the rejected Shuttle Lease (the "Shuttle Settlement Agreement"). Verde Ex. 7. The Shuttle Settlement Agreement does not provide a breakdown of the itemized claims, but promises "full and final satisfaction of all claims" including "proof[ ] of claim numbered 1088." Id. On March 16, 2017, the bankruptcy court held a hearing. Verde Ex, 9. There were no objections to the Shuttle Settlement Agreement, and it was approved by order dated March 17, 2017. Id.
The Coleman Lease
Approximately two months after receiving notice of the Shuttle Bankruptcy, Dougherty began pursuing a new lessee for the Aircraft. Weingart Dep. at 41. After negotiations with one airline failed, on August 30, 2016, Dougherty entered into a new lease agreement with Coleman (the "Coleman Lease"). Verde Ex. 10. That same day, the parties also executed Lease Supplement No. 1 (the "Lease Supplement"), an Assumption of Obligations Agreement (the "Assumption Agreement"), and a Side Letter Agreement (the "Side Letter"), Verde Exs. 11, 12 & 13. Pursuant to these documents, the Coleman Lease was to continue until November 18, 2016, "unless earlier terminated or extended pursuant to the Lease." Lease Supplement at 1. Rent was set at "an amount equal to $0.00 per month initially, until such time as airworthy and in conformity with Lessee's operating certificate, and thereafter $15,000 per month." Coleman Lease at A-2-1.
From the time it entered into the Coleman Lease through the lease's duration, Coleman was a certified air carrier under Part 135 of the Federal Aviation Regulations ("FARs"), 14 C.F.R. § 135, which limited it to operating aircrafts with 30 seats or less. Deposition of John Girzadas Verde Ex. 20 ("Girzadas Dep.") at 13; Weingart Dep. at 35. Shuttle, by contrast, had held a certificate under Part 121 of the FARs, 14 C.F.R. § 121, which authorized it to operate a 50 seat passenger aircraft. The language of the Coleman Lease initially required Coleman to hold "all permits issued by the [Federal Aviation Administration] ... allowing it to operate aircraft ... under Part 121 of the [FARs], Coleman Lease at DOUGHERTY 665; but on November 18, 2016, this language was modified by the removal of the reference to Part 121. Verde Ex. 14.
Coleman also agreed through the Assumption Agreement to "assume all obligations of [Shuttle] under the RVG [Contract]." Verde Ex. 12. To that end, the Coleman Lease set forth "Return Conditions" similar to the "Aircraft Required Conditions" of the RVG Contract, including the "Configuration" language which was exactly the same. Id. at E-1-1. This meant that if Coleman reconfigured the aircraft to 30 seats or fewer, it would have to reconfigure the Aircraft back to its original 50 seat configuration by the end of the lease term. Weingart Dep. at 86. Any potential cost to Coleman for this work, however, was significantly limited by the Side Letter, which provided for Dougherty to "indemnify, hold harmless and reimburse" Coleman for:
any and all claims, damages, losses, liabilities, obligations, contracts, agreements, demands, suits, causes of action, legal proceedings, whether civil or criminal, penalties, fines and other sanctions, and any reasonable attorneys' fees and other reasonable costs and expenses in connection therewith ... which in any way result from, pertain to, or arise out of, or are in manner related to (i) any payment obligations of Replacement Lessee that may arise under the terms and conditions of the RVG arising from the assumption by Replacement Lessee *254 of the obligations of the Original Lessee under the RVG and the Assumption of Obligations Agreement, (ii) any and all fees, costs, and expenses associated with Lessee's duties as contained in Articles 8, 11, 18 of the Replacement Lease; and (ii) [sic] any payment obligations which may be due and payable by Lessee to Lessor at the time of return of the Aircraft under pursuant [sic] to the return condition adjustments or as set forth in Exhibits D, E-1, H (for sums in excess of the insurance policy limits), I; and (iii) any and all costs, expenses and fees incident to ferrying of the aircraft from the delivery location to the Palm Beach International Airport...
Verde Ex. 13 at 2.
On the same day Dougherty and Coleman entered into the Coleman Lease, Dougherty sent a copy to Embraer and asked Embraer to sign the Assumption Agreement confirming Coleman as a Replacement Lease under the RVG Contract. Verde Ex. 16 at DOUGHERTY 2978-79. For the next several months, Embraer sought additional information and disputed whether the Coleman Lease met the requirements for a Replacement Lease and Replacement Lessee under the RVG. Id. at DOUGHERTY 2970-78. Embraer never signed the Assumption Agreement. Answer ¶ 33.
Aircraft Maintenance
Also in August, Dougherty sent the Aircraft to Infinity Aircraft Services ("IAS"), an aircraft maintenance company affiliated with Coleman,[3] to undergo the C Check maintenance work required before the Aircraft could be offered back to Embraer. Answer ¶ 37. Although this meant the Aircraft was not immediately operable, Coleman still believed it could benefit from this maintenance agreement; it had an interest in learning the Aircraft so it could eventually incorporate an EMB-145LR aircraft into its own fleet. Girzadas Dep. at 39-41; Def's Brief, Dkt. 54 at 15-16.
At some point after receiving its initial proposal from IAS, Dougherty learned that the condition of the Aircraft was worse than anticipated, and that the C check would cost significantly more than initially quoted. Weingart Dep. at 136-37, 177. The Aircraft had also been returned without any flight or operational manuals (the "Manuals"), so on August 15, 2016, IAS reached out to Embraer to inquire into the cost of obtaining them from Embraer. Deposition of Paolo Estevao de Carvalho Tullio, Rooney Ex. 1 ("Tullio Dep.") at 104. Due to delays arising from a technical problem with Dougherty's wire transfer, and because Embraer required hard copies of its signed agreement prior to granting access, IAS was not able to access the Manuals fully until September 13, 2016. Rooney Ex. 1 at DOUGHERTY 2767. That access was short-lived. On September 22, 2016, IAS lost access to at least part of the Manuals, id. at DOUGHERTY 2786, and its access was not fully restored until sometime in October 2016. Deposition of John Maker, Rooney Ex, 5 ("Maker Dep.") at 76.
In the meantime, on November 16, 2016, Dougherty notified Embraer of its intent to exercise its right to an extension under Section 5.3(d) stating: "it is currently anticipated that the Aircraft will not be in full compliance with the valuation and return conditions." Id. at Ex. 45, DOUGHERTY 3138. The C check was ultimately completed in late January. Rooney Ex. 1 at Ex. 54. Although Coleman obtained proposals to get the Aircraft reconfigured, that pursuit was ultimately abandoned and the Aircraft's seats were never reconfigured, *255 Girzadas Dep. at 111-13. The Aircraft was also never added to Coleman's operating certificate. Answer ¶ 29. On January 27, 2017, Dougherty wrote to Embraer notifying the company that restoration of the Aircraft had concluded and that it was ready for inspection. Id. Embraer never inspected the Aircraft. Tullio Dep. at 204. Dougherty ultimately sold the Aircraft to a third party for $550,000. Weingart Dep. at 169.
On February 3, 2017, Embraer formally notified Dougherty through counsel that it was rejecting Dougherty's claim to the RVG. That same day, Embraer filed this declaratory judgment action. Dkt. No. 4; Compl..
DISCUSSION
I. Legal Standard
Under the Declaratory Judgement Act ("DJA"), a court may, "in a case of actual controversy within its jurisdiction[,]... declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." § 28 USC 2201. Once filed, declaratory judgment actions are "governed by the Federal Rules of Civil Procedure like any other civil action. The incidents of pleading, process, discovery, trial, and judgment are the same." Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc. , 697 F.3d 59, 63 (2d Cir. 2012) (quoting 10B Charles Alan Wright, et al., Federal Practice & Procedure § 2768 (3d ed.2012) (internal citation and citation marks omitted) ). Thus, the standard for summary judgment in this declaratory judgment action is provided by FRCP 56. Scott v. Harris , 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).
Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c), The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." Harris , 550 U.S. at 380, 127 S.Ct. 1769 (citing Fed. R. Civ, P. 56(c) ). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp. , 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted).
Thus, Rule 56"mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett , 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." Conroy v. N.Y. State Dep't of Corr. Servs. , 333 F.3d 88, 94 (2d Cir. 2003) (citation and alteration omitted). "Even where facts are disputed, the nonmoving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor." Byrnie v. Town of Cromwell Bd. of Educ. , 243 F.3d 93, 101 (2d Cir. 2001), superseded in part and on other grounds by Fed. R. Civ. P. 37(e).
II. Analysis
A. Judicial Estoppel
Embraer first argues Dougherty is estopped from claiming entitlement to *256 the RVG since it already claimed and recovered for the RVG in the Shuttle bankruptcy. Judicial estoppel is an equitable, discretionary doctrine that generally prevents a party from "prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." New Hampshire v. Maine , 532 U.S. 742, 749, 121 S.Ct. 1808, 1814, 149 L.Ed.2d 968 (2001) (quoting Pegram v. Herdrich , 530 U.S. 211, 227, n. 8, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000) ). While the Supreme Court has declined to establish "inflexible prerequisites or an exhaustive formula," for the doctrine, id. at 751, 121 S.Ct. 1808, "[t]ypically, judicial estoppel will apply if: (1) a party's later position is "clearly inconsistent" with its earlier position; (2) the party's former position has been adopted in some way by the court in the earlier proceeding; and (3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." DeRosa v. Nat'l Envelope Corp. , 595 F.3d 99, 103 (2d Cir. 2010). The Second Circuit has further limited judicial estoppel to "situations where the risk of inconsistent results with its impact on judicial integrity is certain." Id. at 103.
i. Dougherty's Position is Clearly Inconsistent with its Earlier Position
Embraer asserts that Dougherty adopted an inconsistent position in the Shuttle Bankruptcy when it claimed the RVG as a loss in its Proof of Claim. As Embraer explains, "Dougherty cannot succeed on bankruptcy claims based on its inability to recover under the RVG, yet also assert counterclaims based on its purported ability to recover under [the] RVG." Pl.'s Brief, Dkt. No. 51 at 10 (emphasis in original). "In the bankruptcy context, whether a party's position ... is inconsistent with its later claims is largely informed by the bankruptcy court's treatment of those claims." Adelphia Recovery Tr. v. Goldman, Sachs & Co. , 748 F.3d 110, 118 (2d Cir. 2014). Additionally, "determination of the ownership of assets is at the core of the bankruptcy process," as this determination is incorporated into the bankruptcy reorganization plan which "thereafter operates, with full preclusive effect, to "bind its debtors and creditors as to all the plan's provisions.' " Id. at 118 (quoting Sure-Snap Corp. v. State St. Bank & Tr. Co. , 948 F.2d 869, 873 (2d Cir. 1991).
The Court agrees with Dougherty that its position taken in the 1088 Proof of Claim, filed in July of 2016, is not inconsistent with the position it takes here. As Dougherty points out, the Claim's addendum expressly disclosed that losing the RVG was a possibility under its contract with Embraer, not a certainty, and lists "Damages for Loss of Residual Value Guarantee" in an amount "To Be Determined," Verde Ex, 6 at Addendum pp.3, 7, Given that this claim was filed in July, 2016 when Dougherty still had four months to find a Replacement Lessee, this was an accurate representation of Dougherty's position at the time and is not inconsistent with the position it would later adopt in the instant case.
Where Dougherty's argument comes a cropper, however, is its subsequent representations to Shuttle's bankruptcy representative on the eve of settlement. On January 20, 2017, Dougherty sent a revised version of its 1088 Proof of Claim to Shuttle's bankruptcy representative (the "Revised Claim") and claimed $3,204,724 for loss of the RVG. Verde Ex. 16 at DOUGHERTY 2970. In the email attached to the Revised Claim, Dougherty's representative writes: "Embraer is disputing any liability under the RVG ... Embraer's refusal to pay is a loss for which Shuttle [ ] is obligated to indemnify Dougherty ...
*257 and is a valid component of Dougherty's claim in the bankruptcy." The position that Dougherty could no longer recover the RVG from Embraer is clearly inconsistent with the position Dougherty adopts here -namely that it is entitled to payment from Embraer under the RVG Contract. Answer ¶ 64.
Dougherty maintains that these positions are not inconsistent because the Shuttle Settlement Agreement, approved by the bankruptcy court, expressly reserved Dougherty rights to make claims against third parties. Def's Brief, Dkt. 54 at 11. But this argument misses the point. Embraer is not arguing that Dougherty has waived its right to sue to enforce the RVG, but only that Dougherty's positions in both proceedings must be consistent. Thus, the waiver and release provisions incorporated into the Shuttle Settlement Agreement are irrelevant.
Dougherty's reliance on the factual/legal position distinction adopted by some courts, see id. at 12, is also not persuasive. See also DeFlora Lake Dev. Assocs. v. Hyde Park , 571 B.R. 587, 599-600 (Bankr. S.D.N.Y. 2017). First, DeFlora expressly notes the Supreme Court has never limited judicial estoppel to positions of fact. Id. at 599. ("Instead, where the situation involves a legal conclusion, the [Supreme Court has held] lower courts were within their authority to insist on an explanation of any inconsistent factual statements that might go to the necessary elements of the claim.") (citing Cleveland v. Policy Mgmt. Sys. Corp. , 526 U.S. 795, 807, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) ). Second, even were the Court to find the legal/factual position distinction settled law, this finding could not save Dougherty's claim here, Although Dougherty's entitlement to the RVG under the contract is certainly a question of law, Dougherty's position in the bankruptcy court was that Embraer was not going to pay the RVG (and impliedly, that it would not sue to enforce it), a representation of fact.
ii. The Bankruptcy Court Adopted Dougherty's Representation
"Adoption of the position by a tribunal-'is usually fulfilled [in the bankruptcy context] when the bankruptcy court confirms a plan pursuant to which creditors release their claims against the debtor.' " Galin v. United States , No. 08-CV-2508(JFB)(ETB), 2008 WL 5378387, at *10 (E.D.N.Y. Dec. 23, 2008) (quoting Negron v. Weiss , No. 06 CV 1288 CBA, 2006 WL 2792769, at *3 (E.D.N.Y. Sept. 27, 2006) ). Here, there can be no dispute that the Shuttle Settlement Agreement released Shuttle from any further litigation with Dougherty over the rejected Shuttle Lease.[4] The only question, then, is whether by accepting the Shuttle Settlement Agreement, the bankruptcy court adopted Dougherty's specific position that Shuttle was required to indemnify it for loss of the RVG.
In a Chapter 11 bankruptcy, "a court may approve a settlement ... if it is fair and equitable and in the best interests of the estate." In re Sabine Oil & Gas Corp. , 555 B.R. 180, 256 (Bankr. S.D.N.Y. 2016) ; Fed. R. Bankr. Pro. 9019 ; see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson , 390 U.S. 414, 441, 88 S.Ct. 1157, 1172, 20 L.Ed.2d 1 (1968) ("a bankruptcy court is not to approve or confirm a plan of reorganization unless it is found to be 'fair and equitable.'); In re Iridium Operating LLC , 478 F.3d 452, 462 (2d Cir. 2007). In making this determination, the court must conduct its own independent investigation into the *258 reasonableness of the settlement, but "[i]t is not necessary for the court to conduct a 'mini-trial' of the facts or the merits underlying the dispute." In re Adelphia Commc'ns Corp. , 368 B.R. 140, 225 (Bankr. S.D.N.Y. 2007). Instead, the court "may rely on the opinions of the debtor, the parties to the settlement, and professionals in evaluating the necessary facts." In re Sabine , 555 B.R. at 257.
Here, the bankruptcy court clearly adopted Dougherty's claim to damages for loss of the RVG when it "determined that the relief sought in the Motion [was] in the best interests of the Debtors, their estates, creditors, and all parties in interest and that the legal and factual bases set forth establish[ed] just cause." Verde Ex. 8. Even taking the facts in the light most favorable to Defendants, simple math establishes that had the bankruptcy court disagreed with Dougherty's claim to damages for loss of the RVG, it would not have approved the $1.95 million dollar settlement. In the Revised Claim, Dougherty claimed a total $3,790,050.87, $3,204,724 (approximately 84.5%) of which is derived from "Loss of the Residual Value Guarantee." Verde Ex. 18 at DOUGHERTY 7316. Subtracting loss of RVG from the total Revised Claim leaves just $585,000. In finding a $1.95 million-dollar settlement fair and equitable, the bankruptcy court ratified the position that Dougherty's ability to recover the RVG from Embraer had been lost.
Dougherty argues that the bankruptcy court could not have adopted its position because the motion filed with court never broke down Dougherty's claims, and because the "fair and equitable" standard does not require an in-depth inquiry. These arguments, however, miss the point of the fair and equitable standard and the bankruptcy court's, to some extent, limited review. It is precisely because the bankruptcy court is not required "to conduct a 'mini-trial' of the facts," In re Adelphia Commc'ns Corp , 368 B.R. at 225, that Dougherty's representations in its Proof of Claim and Revised Claim should be deemed adopted. Had the bankruptcy court conducted its own intensive inquiry into each party's entitlements, Dougherty's own representations (or lack thereof) would not have been nearly as important.
iii. If Permitted to Proceed, Dougherty Would Derive an Unfair Advantage
The Court further finds that Dougherty would derive an unfair advantage. Even taking the facts in the light most favorable to Defendants, Dougherty has already recovered at least more than half of the RVG's value from the Shuttle Bankruptcy ($1,947,184.87-$585,000 = $1,362,184.87).[5] If permitted to proceed on its claim here, there is a risk Dougherty could recover more than a million dollars in excess of even its own, likely bolstered, estimation of the RVG's value. There is no way such a recovery can be deemed fair.
Dougherty argues that it has gained no unfair advantage because Embraer has suffered no prejudice by its prior conduct; Embraer itself will never pay twice on the same claim. This argument is rejected. As already noted, the Supreme Court has mandated courts to adopt a flexible approach to the judicial estoppel doctrine, *259 New Hampshire , 532 U.S. at 750, 121 S.Ct. 1808 ; and although "typically the application of judicial estoppel requires showing unfair advantage against the party seeking estoppel, [the Second Circuit has] not required this element in all circumstances," Adelphia Recovery Tr. v. Goldman, Sachs & Co. , 748 F.3d 110, 116 (2d Cir. 2014) (emphasis added). Dougherty's argument that its failure to recover the full value of the RVG in the Shuttle bankruptcy entitles it to recovery from Embraer is equally unpersuasive. Settlement implies compromise. See Black's Law Dictionary (10th ed. 2014) (defining compromise as "an agreement for the settlement of a real or supposed claim") (emphasis added). Dougherty cannot recover twice on the same contract claim just because it agreed to compromise the first time. After the compromise, the claim no longer exists.
iv. Judicial Integrity Could be Compromised
While judicial estoppel aims to prevent parties from playing "fast and loose" with the courts, Wight v. BankAmerica Corp. , 219 F.3d 79, 89 (2d Cir.2000), proof of intentional deceit is not always required. In re Adelphia Recovery Tr. , 634 F.3d 678, 696 (2d Cir. 2011). In the Second Circuit, "[a] party puts the integrity of the judicial process at risk not only when it knowingly lies but when it takes a position in the short term knowing that it may be on the verge of taking an inconsistent future action." In re Adelphia Recovery Tr. , 634 F.3d 678, 696 (2d Cir. 2011).
The timeline of events clearly establish this standard met in the present case. Dougherty sent its Revised Claim to Shuttle's bankruptcy representative on January 20, 2017. Verde Ex. 18. Less than two weeks later, on February 3, 2017, Embraer filed this declaratory judgment action and on February 13, 2017, Defendant Dougherty was served Embraer's Compl. Dkts. 1 & 5. Meanwhile, a motion requesting approval of the Shuttle Settlement Agreement was filed in the bankruptcy court on February 22, 2017. Verde Ex.'s 7 & 9. On March 16, 2017, a hearing was held for objections to be heard on the settlement. When no objections were voiced, the court approved the Shuttle Settlement Agreement on March 17, 2017.
Dougherty filed its Answer in this action on March 28, 2017. Dkt 21. The Answer is signed by attorneys from the law firm, Fafinski, Mark and Johnson, P.A. ("FMJ"), the same law firm that reviewed Dougherty's email accompanying its Revised Claim months earlier.[6] Even assuming that Dougherty and its lawyers did not know about the impending declaratory judgment on January 20, 2017 when it sent its Revised Claim, they certainly knew of the action, and the position they intended to take in it, when they convinced the bankruptcy court to approve the Shuttle Settlement Agreement in late February. Dougherty itself concedes this point, arguing in its Brief that it only settled with Shuttle on "the expectation that Dougherty could bridge the difference by pursuing litigation against Embraer." Def's Brief, Dkt. 54 at 13.
Looking at "objective conduct of a party or its counsel" In re Adelphia Recovery Tr. , 634 at 696, it is clear that Dougherty sought to recover the maximum amount possible by convincing a New York bankruptcy court to adopt one position, while simultaneously advocating that the New York district court adopt another. This evidence is more than sufficient to show that Dougherty's conduct places the integrity of the judiciary at risk.
*260 In sum, the Court finds all of the factors of judicial estoppel met and holds Dougherty estopped from either defending entitlement to the RVG or counterclaiming for RVG payment in the present case. Accordingly, the Court grants Plaintiff's motion for summary judgment. See Intellivision v. Microsoft Corp. , 484 F. App'x 616, 619 (2d Cir. 2012) (affirming a district court's grant of summary judgment on judicial estoppel grounds).
B. Revival of the RVG
There is a second reason to grant Embraer's motion for summary judgment; the facts establish that Dougherty failed to meet the terms necessary to revive the RVG. There is no dispute that the RVG Contract's choice of law provision controls and that consequently, this contract is governed by New York law. Verde Ex. 3 at § 12; see also Pl's Brief, Dkt. No. 51 at 10; Def's Brief, No. 54 at 14. "Under New York law, '[w]hen the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity.' " MSF Holding Ltd. v. Fiduciary Tr. Co. Int'l , 435 F.Supp.2d 285, 302 (S.D.N.Y. 2006) (quoting Seiden Assocs., Inc. v. ANC Holdings, Inc. , 959 F.2d 425, 428 (2d Cir.1992) ). Here, the Court finds the relevant contract provisions clear and the material facts undisputed. Accordingly, summary judgment is also granted in favor of Plaintiff because the Coleman Lease was not a Replacement Lease and Coleman was not a Replacement Lessee.
i. The Coleman Lease was Not a Replacement Lease
If the contract were terminated, RVG Contract § 3.2(b) enabled Dougherty to revive the RVG by entering into "a replacement lease on substantially the same maintenance, assignment, and return terms and conditions" as the Shuttle Lease. Verde Ex. 3. Embraer argues that the Coleman Lease did not meet this requirement because it (1) fails to meet the definition of a lease under the RVG Contract, and (2) was modified by the Side Letter so that it was no longer "on substantially the same maintenance, assignment and return terms and conditions" as the Shuttle Lease. Pl's Brief, Dkt. 51 at 10-13.
Since the RVG Contract does not define the term "lease," the definition of a lease under New York contract law controls. See MSF Holding Ltd. v. Fiduciary Tr. Co. Int'l , 435 F.Supp.2d 285, 293 (S.D.N.Y. 2006). In New York, a lease is "a transfer of the right to possession and use of goods for a term in return for consideration." NY. U.C.C. Law § 2-A-103 (McKinney). Consideration, in turn, is defined as "either a benefit to the promisor or a detriment to the promisee." Weiner v. McGraw-Hill, Inc. , 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441 (1982). Although "the parties to a contract are free to make their bargain, even if the consideration exchanged is grossly unequal," Apfel v. Prudential-Bache Sec. Inc. , 81 N.Y.2d 470, 600 N.Y.S.2d 433, 616 N.E.2d 1095 (1993), an agreement is not supported by consideration, "[i]f the promisor loses nothing, and the promisee acquires nothing." Granite Partners, L.P. v. Bear, Stearns & Co. Inc. , 58 F.Supp.2d 228, 252 (S.D.N.Y. 1999). While past consideration will not support a contract, consideration can be either "present or future." People v. May , 164 Misc.2d 54, 623 N.Y.S.2d 515 (Sup. Ct. 1995), rev'd on other grounds , 228 A.D.2d 523, 644 N.Y.S.2d 525 (2d Dep't 1996).
The Coleman Lease fails because Coleman provided no consideration for it. Coleman paid nothing to enter into the lease with Dougherty and under the lease terms, was obligated to pay "an amount equal to $0.00 per month initially, until *261 such time as airworthy and in conformity with Lessee's operating certificate, and thereafter $15,000 per month." Ex. 10 § 4.01; A-2-1. Further, through the Side Letter, Dougherty indemnified Coleman for all of Coleman's fees, costs expenses, and payment obligations under the Coleman Lease, including any costs relating to the use, insurance and maintenance of the Aircraft. Verde Ex. 13 at 2. Although the Aircraft should have been airworthy by the end of January 2017, Dougherty concedes that even after the Aircraft was airworthy, Coleman never paid any rent. Weingart Dep. at 177.
Dougherty's arguments to the contrary are rejected. Dougherty argues that Coleman provided future consideration by promising to pay rent eventually but, as just noted, this promise was illusory. Id. Dougherty also argues that Coleman Lease was supported by nonmonetary consideration-it gained the possibility of complying with the RVG Contract, while Coleman assumed contractual obligations while gaining the opportunity to learn about the Aircraft, which it saw as advancing its own business interests-but this is way off base. The consideration it claims here arose not from the Coleman Lease, but from a wholly separate agreement for maintenance work with IAS. See Verde Ex. 21. This contract was entered into prior to the Coleman Lease, with a different entity, and would have continued regardless; it is not valid consideration for the Coleman Lease. See Tierney v. Capricorn Inv'rs, L.P. , 189 A.D.2d 629, 592 N.Y.S.2d 700, 703 (1993) ("Neither a promise to do that which the promisor is already bound to do, nor the performance of an existing legal obligation constitutes valid consideration.")
Statements from Dougherty and its counsel further support the Court's finding that the Coleman Lease was little more than a sham document which Dougherty hoped would help it recover the RVG. For example, in the January 20, 2016 email in which Dougherty sent its Revised Claim, Dougherty states "to mitigate its damages and attempt to cure the Termination Event, Dougherty entered into an unusual replacement lease for no rent which would result in the aircraft being returned to Return Condition by the necessary dates under the RVG." Similarly, in an email exchange between Dougherty's counsel and Coleman during lease negotiations, Dougherty's counsel described the lease stating:
It is not a form that we would want to use a [sic] longer term lease after we've accomplished what we set out to with the RVG , in great part because I have cut out many provisions that would act as normal lessor protections in a normal deal. Given the unusual nature of this lease, however, I believe we can make this bare-bones version work.
Verde Ex. 22 (emphasis added).
Dougherty is correct that Section 3.2(b)'s use of the phrase "substantially the same" is subject to multiple reasonable interpretations and should not be decided on summary judgment. See Pryor v. USX Corp. , 806 F.Supp. 460, 463 (S.D.N.Y 1992). But this Court need not resolve this issue by order to reach a conclusion. The Coleman Lease was not a Replacement Lease under the RVG Contract because it was not a lease at all.
ii. Coleman Was Not a Replacement Lessee
Section 3.2(c) limited Dougherty to finding a Replacement Lessee who, among other things, "is authorized by all applicable laws, rules, and regulations to operate the Aircraft" (the "Authorization Requirement.") Verde Ex. 3. Embraer reads this as requiring Coleman to have been authorized to operate the Aircraft from the moment it entered into the Coleman Lease, *262 but the Court agrees with Dougherty that the language is not so limited. Unlike the third requirement listed in 3.2(c), which explicitly requires compliance "at the time the replacement lease begins," the Authorization Requirement contains no such language. See H & M Hennes & Mauritz LP v. Skanska USA Bldg., Inc. , 617 F.Supp.2d 152, 156 (E.D.N.Y. 2008) (citing RJE Corp. v. Northville Indus. Corp. , 329 F.3d 310, 314 (2d Cir. 2003) (requiring a court to "consider the entire contract in order to avoid adopting an interpretation that would result in an inconsistency between provisions or that would render a particular provision superfluous."). Under 3.2(c), then, Coleman could become a Qualified Replacement Lessee as long as it became authorized to operate the Aircraft before the RVG's Expiration Date.
The parties also disagree as to the period of time in which Dougherty needed to find a Replacement Lessee. Dougherty reads Section 5(d)'s extension provision as applying to the whole RVG Contract, and argues that it had up to 150-180 days after November 18, 2016 to obtain authorization for Coleman to operate the Aircraft. This reading is rejected as plainly inconsistent with the RVG Contract's terms. The first page of the RVG Contract defines "Expiration Date" as November 18, 2016. Section 4's "Condition to Payment" provision, by contrast, requires the Aircraft to comply with the return conditions "on the Expiration Date" or "as such date may be extended provided herein." These provisions make clear that the term "Expiration Date" refers to November 18, 2016 throughout the contract. If "Expiration Date" was instead synonymous with "November 18, 2016 OR as such date may be extended provided herein," it would have been defined as such on the first page. Thus, Coleman can only be deemed a Qualified Replacement Lessee if it met RVG Contract requirements on or before November 18, 2016.
Moving on to Dougherty's proof of compliance, Dougherty claims Coleman met the Replacement Lessee requirement because (1) Part 91.146 of the FARS, ("Part 91"), 14 C.F.R. § 91.146, authorized Coleman to operate the Aircraft even in its 50-seat configuration, and (2) it could have become authorized to operate the Aircraft under Part 135 ("Part 135"), within the lease term, had Embraer not delayed the Aircraft maintenance. Def's Brief, Dkt. 54 at 18-23. The Court finds no support in the record for either claim.
Dougherty's first argument is specious; according to Dougherty's own expert John Maker, Part 91 only authorized Coleman to operate a 50-seat aircraft if it was doing so within a 25-mile radius for demonstrative or maintenance purposes, not for revenue. Maker Dep. at 28-30; see also Girzadas Dep. at 92-93. This is not a logical interpretation of the term "operate," and even Dougherty did not interpret it that way in the early stages of this litigation. See Weingart Dep. at 93.[7] Furthermore, even operating the Aircraft under the Coleman's Part 91 certificate would have required Coleman to obtain a ferry permit, which it did not and could not obtain until after the C Check was complete. See 14 C.F.R. § 91.403(a) and (c) ; 91.405.
As to Dougherty's second contention, the Court finds no reasonable jury could conclude Coleman could have become authorized to operate the Aircraft by November 18, 2016. Coleman concedes that it never intended to apply for a Part 121 *263 certificate, Girzadas Dep. at 66, which means that to become a certified air carrier, it had to reconfigure the Aircraft to 30 seats or less and obtain FAA approval to get the Aircraft added to Coleman's operating certificate. While both parties' experts offer wildly different accounts of how long this process would have taken, there is no dispute that the seats could not have been reconfigured until the C check was complete.[8] Thus, the first relevant inquiry is whether the maintenance work could have been completed on or before November 18, 2016.
This feat is not possible. The record establishes that Dougherty received the Aircraft back from Shuttle in substantially worse condition than it anticipated, which is why Dougherty ended up paying IAS approximately three times its initial estimate for the maintenance work. Weingart Dep. 99-100, 177-78. Given the state of the Aircraft, Coleman's representative John Girzadas estimated in his deposition that notwithstanding any delay in accessing the Manuals, the C Check should have taken three months.[9] Since the contract authorizing IAS to begin work was signed on August 26, 2016, Verde Ex. 21 at 5, by Girzadas' estimate, the C Check would have been completed around November 26, 2016. Needless to say, Coleman could not have reconfigured the Aircraft by November 18, 2016.
John Girzadas' estimation of the Aircraft maintenance work is particularly reliable. Unlike both party's experts, who deal in hypotheticals, Coleman was heavily involved in overseeing the maintenance work that Dougherty actually secured for the Aircraft, and that actually took place. See generally Girzadas Dep. (describing Coleman's extensive involvement in the C Check work and efforts to obtain the Manuals from Embraer). Given that one of Coleman's chief motivations for entering into the Coleman Lease was to learn the Aircraft's set-up and inner workings, Def's Br. at 16, Coleman's close supervision of the maintenance work is consistent with the record and unsurprising.
In sum, because Coleman was not authorized to operate the Aircraft by November 18, 2016 and the Court finds no reasonable jury could conclude Coleman could have become authorized in time, Coleman was not a Replacement Lessee under the RVG Contract.
C. Dougherty's Defenses and Counterclaims
Dougherty raises the affirmative defenses of waiver, laches, estoppel, ratification, prevention, hindrance, and/or unclean hands. The affirmative defenses of waiver, estoppel, and ratification are wholly unsupported in the record and discussed nowhere in Defendant's Brief. See Globecon Grp., LLC v. Hartford Fire Ins. Co. , 434 F.3d 165, 176 (2d Cir. 2006) ("Under New York law, waiver of rights under a contract 'should not be lightly presumed.' "). Instead, the record shows that after Dougherty *264 notified Embraer of the Coleman Lease, Dougherty and Embraer engaged in a series of email exchanges during which Embraer consistently maintained that the Coleman Lease did not meet the terms of the RVG. These messages also contained an express waiver that reserved all rights.[10] Laches is also unfounded given that this lawsuit was filed less than a week after the Dougherty notified Embraer that the Aircraft was ready for inspection, triggering its right to exercise the RVG, and only five months after Embraer received notice of the Coleman Lease. See McCaffery v. McCaffery , No. CV-11-703 (AMD)(AYS), 2018 WL 1598617, at *5 (E.D.N.Y. Mar. 16, 2018). Dougherty's second set of defenses-prevention, hindrance and unclean hands, are also unsupported by the record. Since the Court finds that Dougherty could not have complied with the RVG Contract irrespective of when it was granted access to the Manuals, these defenses are dismissed as immaterial.
Finally, Dougherty counterclaims are dismissed as meritless. Dougherty's first counterclaim, breach of the RVG Contract, is dismissed because the Court holds Dougherty is not entitled to the RVG. Dougherty's second counterclaim for breach of the implied covenant of good faith and fair dealing is also dismissed as duplicative of its breach of contract claim. See Harris v. Provident Life & Acc. Ins. Co. , 310 F.3d 73, 81 (2d Cir. 2002) ("New York law ... does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."); ICD Holdings S.A. v. Frankel , 976 F.Supp. 234, 244 (S.D.N.Y. 1997) (dismissing a party's counterclaim for breach of the implied covenant of good faith and fair dealing under New York law as "redundant").
CONCLUSION
For the above stated reasons, Plaintiffs motion for summary judgment is GRANTED and Defendant's counterclaims are DISMISSED with prejudice.
SO ORDERED

Wells Fargo Bank North, National Association purchased the Aircraft not in its individual capacity but as owner trustee (as successor-in-interest to First Security Bank, National Association, not in its individual capacity but solely as owner trustee, the "Owner Trustee") under a Trust Agreement between Owner Trustee and Transamerica Aviation LLC (as successor-in-interest to TA Air XVI Corp., "Prior Owner Participant").

As successor-in-interest to Chautauqua Airlines, Inc.

Coleman formed IAS in approximately 2015 and maintained an ownership interest in the company. Girzadas Dep. at 7-9.

The Shuttle Settlement Agreement provides: "Claimants shall fully, finally, and forever waive, release and renounce, and discharge the Debtors...from any and all claims." Verde Ex. 7 at 2.

Under the RVG, both Embraer and Dougherty had the right to get an appraisal of the Aircraft to determine its market value. Verde Ex. 3 at 6. Both parties obtained appraisals but never reached agreement as to the Aircraft's Current Market Value. See Weingart Dep. at 119; Verde Ex. 18 at DOUGHERTY 7195; Tullio Dep. at 85. For purposes of this summary judgment motion, the Court adopts the Current Market Value of $2,529,276.00 determined by Dougherty's appraiser, which would have entitled it to $2,470,724.00 under the RVG.

Verde Ex. 18 ("First, let me provide some legal commentary that Kevin Johnson of FMJ assisted in preparing.")

Dougherty designated Alan Weingart as the company's representative pursuant to Fed. R. Civ. P. 30(b)(6). In his deposition, Weingart was asked "[s]o the only way Coleman could operate this aircraft was either reconfigure the seats, the 29 or less, or get certified as a 121 operator?" Weingart Dep. at 93. Weingart replied "Yes." Id.

See Rebuttal Expert Report of John Maker, Rooney Ex.3 at 2 ("For clarification, the seats should have already been removed for maintenance. At the end of the maintenance visit , the seats would be installed...")

In his deposition, Girzadas and the lawyer for Embraer engaged in the following colloquy:
Lawyer for Embraer: We looked at the estimate for the, for the maintenance that IAS submitted and that was submitted at the end of August correct?
Girzadas: August 5th.
Lawyer for Embraer: So assuming it was signed that day, your estimate was that the maintenance would be completed by November 5th, correct?
Girzadas: On or about yes.
Girzadas Depo. at 111-112.

See e.g. , Ex, 16 at DOUGHERTY-02973, 02976 ("This correspondence shall not constitute a waiver of any rights or remedies available to Embraer S.A. under the RVG or otherwise at law or in equity and all such rights and remedies are hereby fully reserved.").