21-872

In re: Bernard L. Madoff Investment Securities LLC

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2021

(Argued: March 16, 2022          Decided: September 20, 2022)

Docket No. 21-872

_____

IRVING H. PICARD, TRUSTEE FOR THE
SUBSTANTIVELY CONSOLIDATED SIPA
LIQUIDATION OF BERNARD L. MADOFF
INVESTMENT SECURITIES LLC, AND
BERNARD L. MADOFF,

*Plaintiff-Appellee*,

SECURITIES INVESTOR PROTECTION CORPORATION,

*Plaintiff-Applicant-Appellee*,

v.

JABA ASSOCIATES LP, THE ESTATE OF
JAMES GOODMAN, ANDREW
GOODMAN, IN HIS CAPACITY AS A
GENERAL PARTNER OF JABA
ASSOCIATES LP, AUDREY M. GOODMAN,
IN HER CAPACITY AS A GENERAL AND
LIMITED PARTNER OF JABA ASSOCIATES
LP, AND IN HER CAPACITY AS

PERSONAL REPRESENTATIVE OF THE
ESTATE OF JAMES GOODMAN, BRUCE
GOODMAN, IN HIS CAPACITY AS A
GENERAL PARTNER OF JABA
ASSOCIATES LP,

*Defendants-Appellants*.[1]

_____

Before: POOLER, WESLEY, and MENASHI, *Circuit Judges*.

Appeal from the United States District Court for the Southern District of New York (Koeltl, *J.*) granting summary judgment to the plaintiff, Irving H. Picard, pursuant to the Securities Investor Protection Act of 1970, 15 U.S.C. §§ 78aaa-78lll ("SIPA"). The district court granted recovery of $2,925,000 that was transferred from Bernard L. Madoff Investment Securities LLC ("BLMIS") to the defendants in the two years prior to BLMIS's filing for bankruptcy. Because there is no genuine dispute of material fact that Bernard L. Madoff transferred the assets of his business to the defendants, which made it recoverable property under SIPA, the district court properly granted summary judgment to Picard.

Affirmed. Judge Wesley concurs in a separate opinion.

---

[1] The Clerk of the Court is directed to amend the caption as above.

2

_____

LANCE GOTTHOFFER, Chaitman LLP, (Helen Chaitman, *on the brief*) New York, N.Y., *for Defendants-Appellants.*

AMY E. VANDERWAL, Baker & Hostetler LLP, (David J. Sheehan, Seanna R. Brown, Tracy Cole, *on the brief*) New York, N.Y., *for Plaintiff-Appellee Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff.*

NATHANAEL KELLEY, Associate General Counsel, Securities Investor Protection Corporation, (Kevin H. Bell, Senior Associate General Counsel, Kenneth G. Caputo, General Counsel, *on the brief*) Washington, D.C., *for Plaintiff-Appellee Securities Investor Protection Corporation.*

POOLER, *Circuit Judge*:

Defendants JABA Associates LP and its general partners—Estate of James Goodman; Audrey Goodman (as General Partner and Personal Representative); Bruce Goodman; and Andrew Goodman—appeal from the March 24, 2021 judgment of the United States District Court for the Southern District of New York (Koeltl, *J.*) granting summary judgment to the plaintiff, Irving H. Picard ("Trustee"), pursuant to the Securities Investor Protection Act of 1970, 15 U.S.C. §§ 78aaa-78lll ("SIPA"). JABA was a good faith customer of Bernard L. Madoff

Investment Securities LLC ("BLMIS") and held BLMIS Account Number 1EM357 (the "JABA Account"). The Trustee brought this action to recover the allegedly fictitious profits transferred from BLMIS to the defendants in the two years prior to BLMIS's filing for bankruptcy. The district court granted recovery of $2,925,000 that BLMIS transferred to defendants in the two years prior to BLMIS's filing for bankruptcy, which made it recoverable property under SIPA. *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 528 F. Supp. 3d 219 (S.D.N.Y. 2021) ("*SIPC*"). The district court also awarded 4 percent prejudgment interest. *Id.* at 245-47.

The defendants first argue that the district court improperly granted summary judgment. They contend that there is a dispute of material fact as to whether Bernard L. Madoff transferred the assets of his sole proprietorship to the defendants, which determines whether the property is recoverable under SIPA. Defendants question some of the Trustee's evidence, particularly the Amended Form BD. As detailed further below, when Madoff reorganized his broker-dealer business from a sole proprietorship to a limited liability company in 2001, he filed an Amended Form BD with the Securities Exchange Commission to reflect the change. Defendants argue that the Amended Form BD is inadmissible

4

hearsay and that an expert opinion the district court purportedly relied upon in admitting the Amended Form BD was not credible. We find plaintiffs waived that argument by not objecting to the admission of the Amended Form BD and by relying upon the form in their own motion for summary judgment.

Defendants also argue that certain evidence, including (1) the name used on JPMorgan Chase & Co. accounts which were in Madoff's personal name and were not changed to BLMIS ownership until September 2002, (2) the endorsement stamp used on one account which was in Madoff's personal name, and (3) the use of Madoff's personal name on checks emanating from another bank account (collectively, the "Account Evidence"), is sufficient to create a dispute of material fact that all assets of the sole proprietorship, including the funds in the JPMorgan accounts at issue here, were transferred to BLMIS.

Yet the Amended Form BD, plus other evidence, indicates that BLMIS took ownership of all the property used in the sole proprietorship and that, therefore, the district court properly concluded that the funds in the JPMorgan accounts are recoverable customer property. The Account Evidence that defendants cite is insufficient to create a dispute of material fact in the face of overwhelming evidence to the contrary.

5

Defendants finally argue that the district court erred in awarding prejudgment interest. The 4 percent interest the district court imposed was not unduly harsh or punitive, and the district court properly justified the amount. We affirm.

**BACKGROUND**

The litigation stemming from the Ponzi scheme Madoff ran through BLMIS, his broker-dealer firm, is well-known to this Court. *See, e.g., In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411 (2d Cir. 2014); *In re Bernard L. Madoff Inv. Sec. LLC* ("*Gettinger*"), 976 F.3d 184 (2d Cir. 2020); *In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d 54 (2d Cir. 2013); *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011). BLMIS was a securities broker-dealer through which Madoff operated three business units: (1) a proprietary trading business; (2) a market-making business; and (3) an investment advisory business (the "IA Business"). BLMIS collected funds from brokerage customers and purported to invest those funds on behalf of the customers, but it did not actually invest the money. Instead, it sent its customers fabricated statements using historical trading activity and returns that had never been generated, and therefore were reflecting fictitious trades and gains. When customers sought to withdraw money from their

6

accounts, BLMIS satisfied those requests with the proceeds of other customers'

investments that were held in a commingled checking account. *See, e.g.*, *In re*

*Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d at 415. The scheme collapsed in

December 2008, when there was not enough new capital to support the

withdrawals that customers sought. *Gettinger*, 976 F.3d at 188. Madoff was

subsequently arrested on criminal charges, and, on the day of his arrest, the SEC

filed a civil action in the United States District Court for the Southern District of

New York alleging that Madoff and BLMIS had operated an unlawful Ponzi

scheme. *Id.*

The Securities Investor Protection Corporation ("SIPC") then became

involved and applied for an order granting BLMIS customers protection under

SIPA. *Id.* After the scheme collapsed, Picard was appointed trustee for BLMIS

pursuant to SIPA, and liquidation proceedings began in the district court. 15

U.S.C. § 78aaa *et seq.*; *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d at 414. Under

SIPA, "[w]henever customer property is not sufficient to pay in full [customers'

net equity claims], the trustee may recover any property transferred by the

debtor which, except for such transfer, would have been customer property if

and to the extent that such transfer is voidable or void under the provisions of

[the Bankruptcy Code]." 15 U.S.C. § 78fff–2(c)(3). Recovered property is treated as customer property and distributed ratably among customers based on their net equity. *Id.*

**I. The Underlying Transfers at Issue**

This appeal pertains to the bank accounts BLMIS used for customer cash that were acquired through the operation of the Ponzi scheme. BLMIS used two bank accounts held with JPMorgan that commingled customer money: a commercial checking account (the "703 Account") and a controlled disbursement account (the "509 Account") that was funded by the 703 Account. The 703 Account was the primary bank account used for BLMIS customer deposits, with 97 percent of the money coming into the account being customer deposits. Customer withdrawals were sent from both the 703 and 509 Accounts.

Madoff's firm operated as a sole proprietorship for over 40 years before he converted it to a single member limited liability company, with Madoff as the sole member, in the early 2000s. On January 12, 2001, using the same SEC Registrant Number Madoff was originally assigned in 1960 (8-8132), Madoff reorganized his firm to an LLC. Madoff informed the SEC of the change in

8

corporate form by filing an Amended Form BD.[2] On the Amended Form BD,

Madoff attested that, "[e]ffective January 1, 2001, predecessor will transfer to

successor all of predecessor's assets and liabilities, related to predecessor's

business. The transfer will not result in any change in ownership or control."

Supp. App'x at 57-58.[3] After filing this form with the SEC, BLMIS succeeded to

the sole proprietorship's SEC Registrant Number, and, as far as the SEC was

concerned, the sole proprietorship no longer operated as a broker-dealer or in

any other capacity. The Amended Form BD asked the applicant to check a box

next to the type of business in which it was engaged, and Madoff checked the

boxes next to "market-making" and "proprietary trading activities," but did not

check the box next to investment advisory ("IA") services.[4] Supp. App'x at 55-56.

---

[2] The SEC requires those who wish to become broker-dealers to file Form BD, the Uniform Application for Broker-Dealer Registration. *See* 15 U.S.C. §§ 78o(a)-(b); 17 C.F.R. § 249.501(a). A successor that continues the business of the broker-dealer previously registered with the SEC that changes the predecessor's operating form must file a Form BD Amendment. SEC Rule 15b1-3(b), 17 C.F.R. § 240.15b1-3(b).

[3] A copy of the Amended Form BD that Madoff filled out is attached here in the appendix to this opinion.

[4] The Trustee notes that Madoff himself admitted that he was hiding his IA business from the SEC at this point. *See* SEC Office of Investigations, *Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme*

9

Also in 2001, BLMIS entered into an Amended and Restated Operating Agreement wherein on the form Madoff stated that he transferred all assets, including bank accounts, held by the sole proprietorship to BLMIS, effective January 1, 2001. *See SIPC v. BLMIS*, Adv. No. 08-01789 (CGM) (Bankr. S.D.N.Y.), ECF Nos. 20429-4, 20467-4, 20571-4, 20578-4, 20649-4. Other documentary evidence that suggests that BLMIS subsumed all parts of the sole proprietorship includes a change in letterhead that listed the firm as "Bernard L. Madoff Investment Securities LLC," letters from BLMIS, account opening agreements, and trading documents that were sent to customers that had previously listed "BLMIS" prior to 2001 and stated "BLMIS LLC" after 2001.

There is minimal evidence that indicates that the JPMorgan accounts continued to be owned by the sole proprietorship and not BLMIS. Some of that evidence is that BLMIS continued to send the same checks to customers both before and after it became an LLC, which were drawn from the 509 Account and listed the name "Bernard L. Madoff" in the top left corner. The endorsement stamp on the 703 Account checks continued to say "[f]or deposit only Bernard L.

*(Public Version)*, Report No. OIG-509, at 182 n.121 (Aug. 31, 2009), https://www.sec.gov/files/oig-509.pdf.

Madoff." App'x at 408-09. And while BLMIS was formed in 2001, Madoff did not change the names on the JPMorgan accounts from his own name to "Bernard L. Madoff Investment Securities" until September 2002. App'x at 408.

In 2006, after the SEC started investigating BLMIS's involvement in the Ponzi scheme, Madoff filed a Form ADV, the application form required for an investment advisor to register with the SEC. On Form ADV, Madoff used the same SEC Registrant Number assigned to his business (8-8132) and signed the form on behalf of "Bernard L. Madoff Investment Securities LLC."

**II.    The JABA Transfers**

As detailed by the district court, prior to the collapse of BLMIS, the defendants initiated three inter-account transfers and seven cash deposits to the JABA account totaling $2,945,000 in principal, as well as two inter-account transfers to a different BLMIS account of $25,000. *SIPC*, 528 F. Supp. 3d at 228. The defendants made 59 withdrawals totaling $10,148,000 from the JABA Account. *Id.* The defendants withdrew $7,228,000 from the JABA account in excess of principal. *Id.* Within the relevant two-year period prior to December 15, 2008, the defendants withdrew $2,925,000 in excess of principal from the JABA

11

Account. *Id.* The defendants do not dispute the date, receipt, or amount of the two-year transfers.

### III. The District Court Decision

The district court granted summary judgment to the Trustee and denied the defendants' cross-motion for summary judgment, holding that BLMIS transferred $2,925,000 in fictitious profits to the defendants in the two-year recovery period, which entitled the Trustee to recover the money, and granted prejudgment interest at the rate of 4 percent. *SIPC*, 528 F. Supp. 3d at 246-47. The district court first reviewed the admissibility of the evidence. The defendants argued that the Trustee's motion rested upon inadmissible evidence, namely the expert reports, BLMIS books and records, trial testimony and plea allocutions. *Id.* at 231. The defendants argued that the Trustee's expert reports were inadmissible because they were based on BLMIS books and records, which themselves were permeated with fraud. *Id.* The district court found the expert reports admissible under Federal Rule of Evidence 702 because it was "plain that the reports help the trier of fact to understand the evidence, are based on sufficient data, are based on reliable principles and methods, and that the experts have reliably applied the principles and methods to the facts of the case." *Id.* The district court

12

also found the defendants' claim that BLMIS's books and records were inadmissible pursuant to the hearsay exception for records of a regularly conducted activity under Federal Rule of Evidence 803(6) because they are "permeated with fraud" to be an unpersuasive argument and found them admissible. *Id.* at 232. As the district court pointed out, if defendants' argument were true, a "case involving fraud would never benefit from expert testimony about the alleged fraud because the records at issue were fraudulent. But a discerning review of the records, particularly when supported by bank statements, can show the details of money that was received by an enterprise and money that was distributed, even if aspects of the records—such as securities that were listed but not purchased—were false." *Id.*

The defendants argued that plea allocutions and trial testimony were also inadmissible. In particular, Frank DiPascali, a former BLMIS employee, testified for 16 days under oath in the criminal trial of Daniel Bonventre, BLMIS's operations manager, that United States Treasury Bills ("T-Bills") purchased with IA Business money were purchased for the sake of BLMIS's own cash management strategy and were not purchased for any customer accounts. *Id.* at 226. DiPascali passed away before defendants here had the opportunity to

13

depose him. *Id.* at 233. The district court found that, pursuant to Federal Rule of Evidence 807, DiPascali's prior testimony was sufficiently trustworthy and admissible. The court found that the various plea allocutions were admissible under Federal Rule of Evidence 803(22), the hearsay exception for judgment of a previous conviction, and Federal Rule of Evidence 807, the residual exception. *Id.*

The district court also found that the Trustee had Article III standing to bring the action against the defendants. The defendants conceded that the Trustee has standing to recover funds transferred by BLMIS but argued that the JPMorgan Accounts and the IA Business were not property of BLMIS and instead were owned by Madoff personally, and therefore the Trustee lacked Article III standing to recover the transfers at issue in this case because the Trustee did not suffer an injury under SIPA. *Id.* at 234.

The district court found that there was no dispute of material fact that all property of the sole proprietorship was transferred to BLMIS, and that such a contention was supported by the Amended Form BD. *Id.* at 234-35. The defendants argued that the unchecked box next to the statement on the form that

14

BLMIS would operate an investment advisory business and the inconsistent names on the account statements and checks gave rise to a dispute of material fact. *Id.* at 235. Additionally, the district court relied on a report filed by the Trustee's expert, Bruce G. Dubinsky, which explained that Madoff not checking a box listing investment advisory services as a business of BLMIS is not dispositive of the question of ownership of the JPMorgan accounts, and that the Amended Form BD made clear that all assets previously owned by the sole proprietorship, including the JPMorgan accounts, were transferred to BLMIS. *Id.* The district court also noted that the defendants did not present any evidence of their own that the unchecked box or the names on the checks and the JPMorgan accounts were dispositive. *Id.*

The defendants also argued that the bankruptcy court's decision in *In re Bernard L. Madoff Inv. Sec. LLC* ("*Avellino*"), 557 B.R. 89, 110 (Bankr. S.D.N.Y. 2016), *reconsideration denied*, 2016 WL 6088136 (Bankr. S.D.N.Y. Oct. 18, 2016), compelled a finding that the Trustee did not have standing. In *Avellino*, the bankruptcy court held that only Alan Nisselson, the Chapter 7 trustee for the Madoff estate, could recover actual transfers by the sole proprietorship, but because he is not a SIPA trustee he could not recover customer property

15

withdrawn prior to January 1, 2001. *Id.* The defendants argued below that *Avellino* compels the result that the Trustee did not have standing to bring this suit. *SIPC*, 528 F. Supp. 3d at 235. The district court distinguished *Avellino* on the ground that it held only that the Trustee could not recover transfers prior to 2001, before BLMIS reorganized as an LLC. *Id.* However, in this case the Trustee only seeks to recover two-year transfers, which the bankruptcy court in *Avellino* held the Trustee may avoid and recover against similarly situated defendants. *Id.*

The district court granted summary judgment to the Trustee holding that SIPA authorized recovery of defendants' fictious profits. *Id.* at 235-41. Under 11 U.S.C. § 548(a)(1)(A), the Trustee may avoid and recover transfers of fictitious profits where: (1) a transfer of an interest of the debtor in property (2) was made within two years of the bankruptcy petition date, and (3) the transfer was made with "actual intent to hinder, delay, or defraud" a creditor. *Adelphia Recovery Tr. v. Bank of Am., N.A.*, Nos. 05-cv-9050, 03-md-1529, 2011 WL 1419617, at *2 (S.D.N.Y. Apr. 7, 2011), *aff'd sub nom. Adelphia Recovery Tr. v. Goldman, Sachs & Co.*, 748 F.3d 110 (2d Cir. 2014). The district court noted there is a presumption of fraudulent intent when the debtor operated a Ponzi scheme and the court found there was no dispute of material fact that Madoff operated a Ponzi scheme after

16

applying a four-factor test to determine whether the presumption should apply. *Id.* at 236-40. After examining all the evidence, the district court determined that the Ponzi scheme presumption should apply and that there was fraudulent intent sufficient to allow the Trustee to recover defendants' profits. *Id.* at 240. This holding is not challenged on appeal.

The district court then reviewed the defendants' affirmative defenses, *id.* at 241-45, none of which have been presented on appeal, before awarding the Trustee prejudgment interest. The Trustee sought prejudgment interest from the date the Trustee filed the complaint against the defendants on November 12, 2010 until the date of the district court's judgment. *Id.* at 245-46. The district court looked at the following factors: "the award should be a function of (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Id.* (quoting *Wickham Contracting Co., Inc. v. Local Union No. 3, Intern. Broth. of Elec. Workers*, 955 F.2d 831, 833-34 (2d Cir. 1992)). The district court found that the 4 percent interest rate represented the prime rate of interest on December 15, 2008, the date of the protective decree beginning the

BLMIS SIPA liquidation, and compensated the Trustee for the loss of the use of the two-year transfers for the years that the litigation has lasted, and reduces the profits to the defendants from having withheld the funds. *Id.*

## DISCUSSION

Although the case before us contains a hefty record spanning decades, the defendants challenge but a few aspects of the district court's decision. Defendants appeal from the district court's holdings that: (1) the content of the Amended Form BD is admissible; (2) the evidence sufficiently proved that Madoff transferred the JPMorgan accounts from the sole proprietorship to BLMIS; and (3) the Trustee is entitled to prejudgment interest.[5] The Trustee and the SIPC additionally argue that the transfers at issue comprise customer property which they argue is recoverable to the Trustee wherever it lies. That is to say, it matters not if BLMIS or the sole proprietorship ultimately owned the

---

[5] The parties have also presented arguments as to the propriety of the *Avellino* bankruptcy decision. We need not reach this issue as we can affirm the district court on the evidence that was before it. We can further distinguish *Avellino* as the district court did: the Trustee only seeks to recover transfers made within the two-year period and thus we need not determine whether *Avellino* was correctly decided. Thus, we may wait until a final decision has been rendered in *Avellino* and an appeal, if any, in that case is properly before us.

18

JPMorgan accounts as long as the funds held in the account comprise customer property. Here, the district court properly analyzed the evidence before it and we can affirm on the record before us.

## I. Admissibility of Evidence

### A. Standard of Review

The defendants argue that the Amended Form BD is inadmissible and that the district court erred by considering it. When a party challenges the district court's evidentiary rulings underlying a grant of summary judgment, we undertake a two-step inquiry. First, "we review the trial court's evidentiary rulings, which define the summary judgment record." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 211 (2d Cir. 2005). Because the "principles governing admissibility of evidence do not change on a motion for summary judgment," *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997), we review the district court's decision to exclude evidence as hearsay for abuse of discretion, *United States v. Coplan*, 703 F.3d 46, 84 (2d Cir. 2012). "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment," and a "district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence." *Presbyterian Church of*

19

*Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (internal quotation marks omitted). A district court abuses its discretion when it bases its ruling "on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or render[s] a decision that cannot be located within the range of permissible decisions." *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (citations and internal quotation marks omitted). At the second stage of our inquiry, "with the record defined, we review the trial court's summary judgment decision *de novo*," construing all evidence in the light most favorable to the nonmoving party. *LaSalle Bank*, 424 F.3d at 205, 211 (internal quotation marks omitted).

### B. Amended Form BD

Before the district court, the defendants did not object to the admission of the Amended Form BD and relied upon the form as a key piece of evidence because of the unchecked box next to the statement that BMLIS would operate an investment advisory business. Now, however, the defendants argue that the Form is inadmissible hearsay. The defendants argue that the Amended Form BD's content does not fall within the business records exception of Rule 803(6) because the SEC did not verify the information that Madoff put on the form,

20

including the statement that the assets of the sole proprietorship would be transferred to BMLIS.

The defendants have waived this argument by making it for the first time before this Court. *Lugo v. Hudson*, 785 F.3d 852, 855 (2d Cir. 2015) ("Because this issue is raised for the first time on appeal, we need not consider it."). In addition, by relying on this evidence in seeking summary judgment, the defendants have "waived any objections to the admissibility of the reports by offering them themselves." *Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005). The defendants below relied on the unchecked box on the Amended Form BD as a central piece of evidence that BLMIS did not control the JPMorgan accounts. *See SIPC*, 528 F. Supp. 3d at 235 ("The defendants did not present any expert testimony to support their proposition that the JPMorgan Accounts were owned by Madoff personally instead of by the LLC. Rather, the defendants rely on the fact that on the Amended Form BD, Madoff did not check a box listing that the LLC would operate an investment advisory business[.]"). While they have changed their argument here, it is unavailing. Had the defendants wished to

21

exclude the Amended Form BD, they had ample opportunity to do so before the district court.[6]

We also reject the defendants' argument that the Amended Form BD is inadmissible hearsay because "the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6). The defendants argue that the Amended Form BD is inadmissible because Madoff pled guilty to submitting false documents to the SEC. In addition to not having made this argument below, the defendants do not argue that the source of information or the method or circumstance of preparation indicate a lack of trustworthiness, beyond stating in conclusory fashion that "Madoff pled guilty to submitting false documents to the SEC. Thus, it is patently unreliable and

---

[6] The defendants also rely on a July 14, 2021 order on a motion in limine in a related case before Judge Furman, also of the Southern District of New York, which did not exclude the Amended Form BD from evidence, but instead ruled that the Trustee must lay the proper foundation at trial to admit the content of the form under Federal Rule of Evidence 703. We note, however, that Judge Furman also relied upon the Amended Form BD in his motion for summary judgment, writing that the Amended Form BD, while supporting the Trustee's claim, also created a dispute of material fact because of the unchecked box. *See Picard v. RAR Entrepreneurial Fund, Ltd.*, No. 20-cv-1029, 2021 WL 827195, at *11 (S.D.N.Y. Mar. 3, 2021). The fact that the Trustee needed to lay a foundation at trial does not make it inadmissible hearsay, despite what the defendants claim.

22

untrustworthy. Hence, the untrustworthy contents of Form BD are inadmissible hearsay." Appellants' Br. at 29.

Rule 803(6) aims to ensure that documents were not created for "personal purpose[s] . . . or in anticipation of any litigation" so that the creator of the document "had no motive to falsify the record in question." *United States v. Kaiser*, 609 F.3d 556, 574 (2d Cir. 2010) (quoting *United States v. Freidin*, 849 F.2d 716, 719 (2d Cir. 1988)). The rule "favors the admission of evidence rather than its exclusion if it has any probative value at all." *Id.* (internal quotation marks omitted).

The defendants have failed to meet their burden of showing that the source of information or the method or circumstance of preparation indicate a lack of trustworthiness. The fact that Madoff himself was untrustworthy does not necessarily make the Amended Form BD itself untrustworthy. Such a broad ruling would keep out evidence in fraud trials because the person at the center of the fraud committed duplicitous acts.

The defendants next argue that the Amended Form BD was inappropriately admitted as a business record based on the expert report filed by Bruce Dubinsky, whom defendants claim gave prior testimony that rendered

23

him not credible. The district court stated that "[t]he Dubinsky Report explains that the fact that Madoff did not check a box listing investment advisory services as a business of the LLC is not dispositive of the question of ownership of the JPMorgan accounts, and that the Amended Form BD made clear that all assets previously owned by the sole proprietorship, including the JPMorgan Accounts, were transferred to the LLC." *SIPC*, 528 F. Supp. 3d at 235. Yet there is nothing in the ruling that suggests that the district court relied on Dubinsky's opinion in admitting the Amended Form BD. Therefore, we need not reach any of defendants' arguments regarding Dubinsky's credibility as an expert.

**II. Whether There Is Sufficient Evidence to Grant Summary Judgment**

**A.    Standard of Review**

"We review a district court's decision to grant summary judgment *de novo*, construing the evidence in the light most favorable to the party against which summary judgment was granted and drawing all reasonable inferences in its favor." *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016) (internal quotation marks omitted). We affirm "only if there is no genuine issue of material fact and the prevailing party was entitled to judgment as a matter of law," *id.*, but summary judgment "must be rejected if the evidence is such that a reasonable jury could

24

return a verdict for the nonmoving party," *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 465 (2d Cir. 2001) (internal quotation marks omitted).

### B. Evidence There Was a Transfer of an Interest of the Debtor in Property

The defendants argue that there is a dispute of material fact as to whether BLMIS took control of the JPMorgan accounts, rendering summary judgment inappropriate. In the district court, the defendants argued that the Trustee could not avoid the transfers because there was no evidence that the JPMorgan accounts and the IA Business were property of BLMIS. Defendants argued those accounts were owned by Madoff personally, such that the Trustee could not claw back the transfers. *SIPC*, 528 F. Supp. 3d at 234. Both parties agree that prior to 2001, Madoff's sole proprietorship held the JPMorgan accounts used by the IA Business, and that Madoff converted his firm to an LLC in 2001. Defendants claim that after Madoff converted his firm, Madoff's sole proprietorship continued to run the IA Business, while the proprietary trading business and market-making business were operated by BLMIS.[7]

---

[7] In fact, it is undisputed that the LLC had at least some investment advisory clients. Madoff's investment advisory clients who opened accounts after 2001

25

Defendants claim their argument is supported by inconsistencies in the name on the JPMorgan accounts, the name on the endorsement stamp for the 703 Account, and the name used on the 509 Account checks. They argue this is enough to raise a question of material fact. While the LLC was formed in January 2001, Madoff did not change the name on both of the JPMorgan accounts to BLMIS until September 2002. Additionally, the endorsement stamp on the 703 Account checks remained "[f]or deposit only Bernard L. Madoff," and the 509 Account checks continued to bear Madoff's personal name long after 2001. All checks paid to JABA indicated the account was owned by "Bernard L. Madoff."

However, this sparse evidence is insufficient to create a dispute of material fact, as the district court correctly found. It is undisputed that the LLC operated an investment advisory business because it executed client agreements for investment advisory services and sent statements to investment advisory clients.

entered into customer agreements with the LLC, *see* Exhibit 3, SIPC v. BLMIS, No. 08-01789 (Bankr. S.D.N.Y. Dec. 22, 2020), ECF No. 10662-3, and previous clients—including JABA Associates—received statements on the LLC's letterhead, Supp. App'x 1411-16. At oral argument, the defendants clarified that their position is that Madoff was operating two IA Businesses: one through the sole proprietorship and one through the LLC. Oral Argument Audio Recording at 7:57.

*See supra* note 7. The defendants argue that the sole proprietorship nevertheless continued to operate a separate and independent investment advisory business. But that argument ignores the overwhelming evidence that BLMIS took over all aspects of the sole proprietorship. With the Amended Form BD, Madoff indicated that he would change the corporate form of the business and retained the same SEC Registrant Number (8-8132) he had since January 1960. On these forms, Madoff attested that he was transferring all of the predecessor's assets to the successor and that the transfer would not result in any change in ownership or control. After the SEC filing, BLMIS succeeded to the sole proprietorship's SEC Registrant Number, and, as far as the SEC was concerned, the sole proprietorship no longer operated as a broker-dealer or in any other capacity. The Amended Form BD stated that all assets transferred to BLMIS and that no "accounts, funds, or securities of customers of the applicant are held by or maintained by [any] other person, firm, or organization[.]" Supp. App'x at 52-53.

Where the form asked what kind of businesses in which it was engaged, Madoff selected "market-making" and "proprietary trading activities," yet the box next to investment advisory services was unchecked. Supp. App'x at 55-56. Defendants below argued that this unchecked box sufficed to create a genuine

27

issue of material fact. Before us, however, defendants argue that the Amended Form BD is inadmissible, although they rely on the unchecked box on the form in the alternative. Defendants also point to a district court decision in a related case before Judge Furman that partially relied on the one unchecked box on the Amended Form BD in denying the Trustee's motion for summary judgment. *See Picard v. RAR Entrepreneurial Fund, Ltd.*, 2021 WL 827195. In reviewing the same evidence that was before the district court here, Judge Furman denied summary judgment on the ground that there was insufficient evidence to support a finding that "no reasonable factfinder could conclude that either Madoff himself or the sole proprietorship retained ownership over the 703 and 509 Accounts even after the LLC's formation in 2001." *Id.* at *11.[8]

---

[8] After a trial on the issue of whether the investment advisory business, including the JPMorgan accounts, was transferred to BLMIS, making the transfers recoverable under SIPA, a jury returned a unanimous verdict in favor of the Trustee. *Picard v. RAR Entrepreneurial Fund, Ltd.*, No. 20- cv-01029 (S.D.N.Y. Mar. 7, 2022), ECF No. 132. Other cases that have analyzed similar facts have held that similar transfers were made by the LLC. Two of these were decisions rendered after trial. *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* ("*Bam II*"), 624 B.R. 55 (Bankr. S.D.N.Y. 2020); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* ("*Nelson*"), 610 B.R. 197 (Bankr. S.D.N.Y. 2019). Yet other cases all confronted similar evidence at the motion for summary judgment and found there was sufficient evidence to determine that BLMIS caused the transfers at issue here,

We disagree and affirm the district court's finding that the record did not raise a question of material fact as to whether BLMIS owned the JPMorgan accounts. As the district court pointed out: (1) when Madoff changed the form of his business from sole proprietorship to an LLC, the business retained the same SEC registration number; (2) the Amended Form BD noted that the LLC "will transfer to successor all of predecessor's assets and liabilities related to predecessor's business. The transfer will not result in any change in ownership or control," and "there were no assets or liabilities of the sole proprietorship listed as 'not assumed by the successor,'" *SIPC*, 528 F. Supp. 3d at 234-35; and (3) the form also indicated that no "accounts, funds, or securities of customers of the applicant are held by or maintained by [any] other person, firm, or organization," *id.* at 235.

Additionally, while the Trustee submitted an expert's opinion that Madoff's failure to check this box on the Amended Form BD was not dispositive

---

making it recoverable property under SIPA. *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* ("*Miller*"), 631 B.R. 1 (Bankr. S.D.N.Y. 2021); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* ("*Keller*"), 634 B.R. 39 (Bankr. S.D.N.Y. 2021); *In re Bernard L. Madoff Inv. Sec. LLC*, No. 21-cv-02334, 2022 WL 493734 (S.D.N.Y. Feb. 17, 2022).

29

of the question of ownership and that the Form made clear that all assets of the sole proprietorship were transferred to the LLC, the defendants do not point to any expert opinion that would rebut this contention. In fact, the defendants do not point to *any* evidence that the accounts were owned by Madoff personally instead of BLMIS. To survive summary judgment, defendants cannot simply raise "some metaphysical doubt as to the material facts," *Bellamy v. City of New York*, 914 F.3d 727, 754 (2d Cir. 2019) (internal quotation marks omitted), or present evidence that is "merely colorable," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). Instead, defendants must "designate specific facts showing that there is a genuine issue for trial." *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

Defendants claim that they did not need expert testimony regarding the ownership of the bank accounts because owning a bank account is a common experience for adults in the United States, and therefore one "does not need to pay an expert witness . . . to opine on the ownership of a bank account." Appellants' Br. at 23-24. This argument is unavailing because Madoff was not engaged in the type of banking the average U.S. adult would undertake. Rather,

Madoff operated a massive Ponzi scheme which he took pains to hide for years. As the district court pointed out, improperly filled-out forms and other sleights of hand are what one would expect when "exhuming the remnants of a Ponzi scheme." *SIPC*, 528 F. Supp. 3d at 235 (citation omitted).

Defendants claim the undisputed facts show that the LLC never owned the JPMorgan accounts, but they have pointed to no material evidence of this. In contrast, the Trustee relies on substantial evidence that BLMIS owned these accounts. Because there is no dispute of material fact as to the ownership of the JPMorgan accounts, the district court did not err in granting summary judgment on this ground.

## III. Prejudgment Interest

Finally, the defendants argue that awarding prejudgment interest was an abuse of discretion because they are innocent victims of fraud themselves and should not be penalized for defending themselves in court. Defendants argue that: (1) there was no statutory basis for an award of prejudgment interest under 11 U.S.C. § 548; (2) prejudgment interest is inappropriate where the defendants did nothing wrong; (3) the Trustee was responsible for any delay; and (4) the district court's award of 4 percent interest was excessive and punitive.

31

Some of the factors a district court considers when awarding prejudgment interest include: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Wickham Contracting Co.*, 955 F.2d at 833-34. Judgments based on both federal and state law apply the federal interest rate to prejudgment interest calculations. *Thomas v. iStar Fin., Inc.*, 629 F.3d 276, 280 (2d Cir. 2010).

While 11 U.S.C. § 548 does not expressly authorize an award of prejudgment interest, the Supreme Court has upheld an award "despite the silence of the laws on the subject of interest." *Wickham*, 955 F.2d at 834. However, prejudgment interest may not be awarded when Congressional intent is to the contrary, which may be obvious from the language of the statute itself. *Id.* "Even when the statute is silent, intent to deny recovery of interest may be inferable from (i) the state of the law on prejudgment interest, for the type of claim involved, at the time the statute was passed, and (ii) consistent denial by the courts of prejudgment interest under the statute and failure by Congress, despite amendments to the statute, to address prejudgment interest awards." *Id.*

32

Here, the defendants argue that the Bankruptcy Code does not authorize an award of prejudgment interest because the statute is silent. Yet defendants do not make any argument that this silence is dispositive, nor that we can make any inference that an award of prejudgment interest is not authorized by the statute. In fact, prejudgment interest has been awarded against other similarly situated defendants in related SIPA litigation. *See, e.g.*, *Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*, No. 08–01789 (SMB), 2018 WL 1442312, at *15 (S.D.N.Y. Bankr. Mar. 22, 2018), *report and recommendation adopted*, 596 B.R. 451 (S.D.N.Y. 2019), *aff'd,* 976 F.3d 184 (2d Cir. 2020); *Nelson*, 610 B.R. at 238; *Bam II*, 624 B.R. at 65-66. While there is no express authorization in Section 548, this does not mean that it is forbidden by the statute. Defendants point to no case law that has expressly held the opposite and we decline to do so today.

Additionally, in light of the *Wickham* factors, we cannot find that the district court abused its discretion in awarding prejudgment interest against the defendants. While the defendants claim that it would be unfair to award prejudgment interest because they were innocent, "wrongdoing by a defendant is not a prerequisite to an award." *Lodges 743 & 1746, Int'l Ass'n of Machinists & Aerospace Workers v. United Aircraft Corp.*, 534 F.2d 422, 447 (2d Cir. 1975).

33

Defendants may be operating in good faith and certainly have a right to litigate their case, but that does not change the fact that they have benefited from other customers' stolen property and have not returned it for over a decade.

Nor do we agree with the defendants' assertion that the district court's award of 4 percent interest was unnecessarily harsh or punitive. The district court surveyed other cases where prejudgment interest was awarded that ranged from awards of 9 percent to 4 percent. *SIPC*, 528 F. Supp. 3d at 246. The district court awarded 4 percent, the prime interest rate on December 15, 2008, which is the date of the protective decree beginning the BLMIS SIPA liquidation. *Id.* The district court found that this amount compensated the Trustee for the loss of the use of the two-year transfers and reduces the profits to the defendants from having withheld the funds. The district court appropriately balanced the equities between the parties. Given this, the district court did not abuse its discretion in granting an award of 4 percent prejudgment interest to the Trustee.

**CONCLUSION**

We have considered the defendants' remaining arguments on appeal and conclude that they are without merit. We therefore AFFIRM the judgment of the district court.

34

**21-872**

*In re: Bernard L. Madoff Investment Securities LLC*

WESLEY, *Circuit Judge*, concurring:

I concur in Judge Pooler's fine opinion. The Majority opinion concludes that there is no genuine dispute of material fact as to whether BLMIS owned the JPMorgan accounts. The opinion endorses the district court's view that the accounts in fact were owned by BLMIS because they were integral parts of the IA Business it operated exclusively. While I agree with my colleagues and the district court that BLMIS solely operated the IA Business once the firm became an LLC, I do not think that determines the account ownership issue nor do I see a reason to resolve it. For me, it matters not. What matters is who ran the IA Business—Madoff individually or BLMIS? If only the latter, then the Trustee can reach the transfers made to the defendants from those accounts and that ends the matter.

As Judge Pooler points out, the only evidence before the district court regarding the IA Business after Madoff converted his firm into an LLC establishes that the firm's investment advisory customers only did business with BLMIS. There is no genuine issue of material fact here. BLMIS's Amended and Restated Operating Agreement stated that BLMIS was "formed to receive as at [sic] January 1, 2001, all of the assets, subjects to liabilities, associated with business being

conducted by Bernard L. Madoff, as sole proprietorship." *SIPC v. BLMIS*, Adv. No. 08-01789 (CGM) (Bankr. S.D.N.Y.), Dkt Nos. 20429-4, 20467-4, 20571-4, 20578-4, 20649-4. The customer agreements for those who became IA Business customers prior to 2001 expressly stated these agreements would "[i]nure to the benefit of . . . any successor organization." Supp. App'x at 1517. As a result of the firm's reorganization, all the sole proprietorship's investment advisory customers became customers of BLMIS. Indeed, the firm's correspondence and relationship with its investment advisory customers reflected this change. For instance, the firm's name atop the letterhead of the monthly customer statements it sent to IA Business customers changed from "Bernard L. Madoff" to "Bernard L. Madoff Investment Securities LLC." Supp. App'x at 640, Figure 24; Supp. App'x at 1411–16. And as the Majority observed, the investment advisory customers who opened accounts with the firm after it became an LLC in 2001 signed customer agreements with BLMIS. *See supra* note 7.

The defendants offered not a shred of evidence, except names on the JPMorgan checking accounts, to suggest that, after the firm became an LLC, either the sole proprietorship maintained any investment advisory business relationship with customers or that BLMIS did *not* operate an investment advisory business.

2

Evidence related to ownership of the JPMorgan accounts only does not "designate specific facts showing that there is a genuine issue for trial" about whether BLMIS or the sole proprietorship maintained an investment advisory business, *Parker*, 260 F.3d at 111, especially since it is undisputed that the funds received from customers both before and after the firm became an LLC were commingled in the accounts.

The Trustee and the Majority rely on the Amended Form BD to contend that ownership of the checking accounts was transferred from the sole proprietorship to BLMIS in 2001.[1] But the form, prepared by Madoff, is only direct evidence of what he represented to the SEC about BLMIS. JPMorgan's own recital on their checks and statements is undoubtedly a significant indication of who owned the accounts. There is nothing in the record evidence even suggesting that JPMorgan,

---

[1] As the Majority rightly notes, the Amended Form BD is inconsistent. The form, as the Majority mentions, indicates that BLMIS succeeded to all the sole proprietorship's assets, but it does not indicate that BLMIS would operate an investment advisory business. The Amended Form BD also lists the new name of Madoff's business as "Bernard L. Madoff Investment Securities LLC," Supp. App'x at 49, but represents that the legal status and organizational structure of his business would remain a sole proprietorship, Supp. App'x at 51. In hindsight, it is likely that the Amended Form BD was just another instrument of Madoff's fraud.

3

as the commercial bank maintaining and servicing the accounts, ever recognized BLMIS as the owner of the accounts.

While the firm could unilaterally change the nature of its own business structure and its relationship with its customers, it could not change the ownership of the bank accounts it used without *at least* notifying JPMorgan. Notably, Madoff sent letters to various governmental agencies and the Bank of New York, which maintained the bank accounts for the firm's proprietary trading and market-making businesses, notifying them of the firm's change to an LLC, but never to JPMorgan. There are no JPMorgan documents reflecting a change in ownership.

To show that a "transfer of an interest of the debtor in property" was made, *Adelphia Recovery Tr.*, 2011 WL 1419617, the Trustee need only establish that "the property he is seeking to recover was 'customer property' prior to the transfer," Supp. App'x at 1684; *SIPC v. BLMIS*, 631 B.R. 1, 8 (Bankr. S.D.N.Y. 2021). SIPA defines customer property as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer." 15 U.S.C. § 78lll(4).

While I may quibble with the Majority as to whether there is a genuine dispute of material fact regarding who owned the JPMorgan accounts, that is not

4

dispositive of this appeal. As other Circuit Courts have held, cash and securities can still be customer property even if they were never deposited in a bank account owned by the debtor.[2] The same goes for cash in a customer's brokerage account when that brokerage account was transferred to the debtor from a predecessor brokerage firm. *See In re Brentwood*, 925 F.2d at 329–29. "The relevant inquiry is whether the brokerage firm actually received, acquired or possessed [the customer's] property" since SIPA protects customers "who attempt to invest

---

[2] *See Peloro v. U.S.*, 488 F.3d 163, 173–74 (3d Cir. 2007) (holding that bearer bonds were customer property that had been mailed to the debtor and held by the debtor but seized by the FBI both before they were allocated to any debtor account and the SIPA liquidation proceedings had begun); *In re Primeline Sec. Corp.*, 295 F.3d 1100, 1107 (10th Cir. 2002) (holding that cash was still customer property where the customers, at the instruction of the debtor's employee, wrote checks made out to the employee and various non-debtor companies but the employee met with the customers at the debtor's office, provided potential investors with business cards reflecting his position at the debtor, had customers complete debtor new account forms, and sent fraudulent statements on debtor letterhead); *In re Old Naples Sec., Inc.*, 223 F.3d 1296, 1303 (11th Cir. 2000) (holding that cash was still customer property where the customers gave it to an agent of the debtor who represented he would invest the cash with the debtor but actually deposited their money in a separate, non-debtor company's account and used some of the money in that account to pay the debtor's expenses); *In re Brentwood Securities, Inc.*, 925 F.2d 325, 329–30 (9th Cir. 1991) (holding that cash was still customer property where it was originally deposited in the brokerage account of the former brokerage firm of the debtor's president and that brokerage account was later transferred to the debtor broker-dealer after the president purchased the debtor); *In re Stalvey & Assoc., Inc.*, 750 F.2d 464, 469 (5th Cir. 1985) (finding bonds to be customer property where the debtor, through the debtor's president or one of its employees, "had at least access to the bonds . . . and physical possession of the bonds").

5

through their brokerage firm" and "reasonably follow[ ] the broker's instructions regarding payment" but "are defrauded by dishonest brokers." *Primeline Sec. Corp.*, 295 F.3d at 1107; *In re Old Naples*, 2223 F.3d at 1303. Consequently, the real metric is "control over all of the [customers'] funds," not ownership of the bank account housing them. *In re Old Naples*, 223 F.3d at 1304.

Here, there is no genuine dispute of material fact that the LLC directed the transfers; the funds making up the transfers were customer property prior to being made to the defendants even if they were not kept in a bank account owned by BLMIS. At the time of the transfers, the defendants' only investment advisory relationship with the firm was with BLMIS. As discussed above, once Madoff converted the firm into an LLC, BLMIS solely operated the IA Business. As a result, the investment advisory relationship for the customers shifted from the sole proprietorship to BLMIS. Nothing changed about how the firm ran its IA Business: BLMIS maintained the same fraudulent scheme, BLMIS still used the only SEC Registrant Number assigned to the firm from its inception, and BLMIS still commingled money it received from its customers in the JPMorgan accounts and used the same checks from those accounts to send customer money. BLMIS controlled its customers' money in the JPMorgan accounts the same way the sole

6

proprietorship once did. Thus, neither the name on the checks nor where BLMIS parked customer money is relevant; the funds maintained in the accounts were still "received, acquired, or held . . . for the account of" BLMIS "from or for the securities account of" its investment advisory customers. 15 U.S.C. § 78lll(4); *see Peloro*, 488 F.3d at 173–74; *In re Primeline Sec. Corp.*, 295 F.3d at 1107; *In re Old Naples Sec., Inc.*, 223 F.3d at 1303; *In re Brentwood*, 925 F.2d at 329–29.

I agree with the Majority that once Madoff converted the firm into an LLC, BLMIS operated the firm's only investment advisory business. I do, however, disagree with the Majority's conclusion that the evidence does not create a genuine dispute of material fact as to whether BLMIS owned the JPMorgan accounts. As a result, I believe this case is best resolved by looking at the level of control BLMIS exercised over the JPMorgan accounts in solely operating the IA Business. In doing that, I think it is clear BLMIS made the transfers. I respectfully concur.